Entered: January 13th, 2017
Signed: January 13th, 2017



**ROBERT A. GORDON**
**U.S. BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | | |
|---|---|---|
| In re: | * | |
| | | |
| CITY HOMES III LLC | * | Case No: 13-25370 |
| CITY HOMES, INC. | | Case No: 13-25371 |
| CITY HOMES BRETTON LLC | * | Case No: 13-25372 |
| CITY HOMES EAST BUSINESS TRUST | | Case No: 13-25373 |
| CITY HOMES JOHNSTON SQUARE LLC | * | Case No: 13-25376 |
| CITY HOMES MANAGEMENT LLC | | Case No: 13-25377 |
| CITY HOMES NEWINGTON LLC | * | Case No: 13-25378 |
| CITY HOMES OCALA LLC | | Case No: 13-25379 |
| CITY HOMES PATRIOTS II LLC | * | Case No: 13-25380 |
| CITY HOMES PEABODY LLC | | Case No: 13-25381 |
| CITY HOMES ROYALTON LLC | * | Case No: 13-25382 |
| CITY HOMES WEST BUSINESS TRUST | | Case No: 13-25383 |
| | * | (Chapter 11) |
| Debtors | | |
| | * | (Jointly Administered under |
| | | Case No. 13-25370-RAG) |
| | * | |

*   *   *   *   *   *   *   *   *   *   *   *   *

**MEMORANDUM OPINION DENYING CONFIRMATION,**
**VACATING ORDERS AND REQUIRING THE APPOINTMENT OF A TRUSTEE**

*"It is not necessary to accept everything as true, one must only accept it as necessary."*

-   *'The Trial' Franz Kafka*

1

## I.   Preliminary Statement

The central question to be answered by this Opinion is whether individuals affiliated with the Debtors who are not themselves in bankruptcy should forevermore be protected by an injunction and release of liability (Release) buried in the proposed Final Plan that is intended to nullify the rights of unknown, unaware and unrepresented claimants, none of whom agreed to the permanent impediment of the Release or likely had actual notice of, or an opportunity to either object to, or vote upon, the same. [1]  The burden is squarely upon the Plan Proponents to justify the Release but the evidence they marshal  falls far short of the criteria set forth in *Behrmann v National Heritage Foundation, Inc.,* 663 F. 3d 704 (4th Cir. 2011) (*NHF I*) and *National Heritage Foundation, Inc.* v. *Highbourne Foundation,* 760 F. 3d 344 (4th Cir. 2014) (*NHF II*). Therefore, this Court is left with no alternative but to reject the Release.  And because the proponents present the plan as their absolute best offering, an un-severable, "all or nothing" proposition, the rejection of the Release in this three years old case necessarily leads to the denial of confirmation and the appointment of a trustee.

The Debtors, the Committee and the United States Trustee (UST) unanimously support approval of the Release and confirmation of the Final Plan as is. [2]  They assert that the Release is

---

[1] The Debtors are City Homes, Inc. (CHI), City Homes Management LLC (CH Management), City Homes Bretton LLC, City Homes III LLC, City Homes Johnston Square LLC, City Homes Newington LLC, City Homes Ocala LLC, City Homes Patriots II LLC, City Homes Peabody LLC, City Homes Royalton LLC, City Homes East Business Trust and City Homes West Business Trust.  The Release is included in Articles 9.4 and 9.6 of the Second Amended Chapter 11 Plan Jointly Proposed by the Debtors and the Official Committee of Unsecured Creditors (Further Modified) filed after the conclusion of the Confirmation Hearing at Dkt. No. 733 on April 15, 2016.  In this Opinion, that plan will be referred to as the Final Plan.  The phrase, Plan Proponents, will mean the Debtors and the Official Committee of Unsecured Creditors (Committee).  The intended beneficiaries of the Release are named Protected Parties by the Final Plan.

[2] The Court is mightily perplexed by the UST's support for the Release.  The UST's position here should be compared with her unyielding opposition to non-debtor, third-party releases in the *In re: Neogenix Oncology, Inc.*, 508 B.R. 345 (Bankr. Md. 2014) and *In re: Neogenix Oncology, Inc.*, 2015 WL 5786345 (Bankr. D. Md. Oct. 1, 2015) cases where, unlike here, the impacted class was actually represented and the evidence in support of the release and injunction, (which included a significant personal, material sacrifice of valuable rights by the non-debtor

vital, fair and in everyone's best interest.  Applying Kafka's construct, they would have the Court accept the "necessary" over the "true", to pound the square pegs of the facts into the round holes of the Fourth Circuit's analytical framework.  The question of whether to approve a non-debtor, third-party release is at bottom a matter of equity and a matter of equity is a matter conscience.  The Court's conscience is greatly troubled by the Plan Proponents' strategy because the unrepresented and unknown parties targeted by the Release – post-1999 tenants of the Debtors who potentially have been poisoned by exposure to lead paint but whose claims are likely not covered by the Debtors' liability insurance (Uninsured Claimants) – have had no say in the grand legal strategy set to nullify their state law rights against the putative, non-debtor beneficiaries of the Release.

The Final Plan is a simple liquidating plan and, with modifications, the Court would likely, eventually, confirm it without the Release.  But confirmation of the Final Plan with the Release is a different question altogether and to do so would be the antithesis of equity; if a non-debtor release should be approved in this Chapter 11 case then such releases should be approved in every Chapter 11 case, merely for the asking.  Because neither the facts nor the law justify that result, and the Final Plan must be viewed as the Plan Proponents' absolute best effort, there is no alternative but to appoint a trustee to wind up the Debtors' affairs and proceed to a managed liquidation.

---

beneficiaries of the release and injunction and the members of the impacted class having actual knowledge of the same coupled with their nearly unanimous favorable vote) and equities afforded the impacted class, turned out to be significantly better in quality than the exceedingly less than compelling circumstances presented by this case.  In the end, this Court still searches for an answer as to why the UST thinks the Release is a good idea and would set a wise precedent.

II.   **Case History**

 *(a) The First Fifteen Months*

The Debtors each filed their voluntary Chapter 11 Petitions on September 10, 2013 (Petition Date).  Three "first day" motions were also filed.  One was a Motion for an Order Directing Joint Administration of their Related Chapter 11 Cases (Dkt. No. 5), with an amended version (Joint Administration Motion) filed on September 11, 2013 (Dkt. No. 10).  The Joint Administration Motion explained the basic organizational relationship between CHI and the other Debtors, namely that CHI is the sole trustee of the two business trusts and is the sole member of the remaining limited liability entities.[3]  The other Debtors were described as "affiliates" with "common ownership through CHI" and because of this interconnectedness, the Joint Administration Motion was granted on September 12, 2013 and the cases have since been collectively administered through the portal of City Homes III's Docket.[4]  The corporate Debtor, CHI, does not own any real estate.  *See* Case No. 13-25371, Dkt. No. 33 at pg. 3 (Schedule A).  Instead, the improved real estate assets, which the Debtors have used to conduct their long-standing landlord-tenant business, are all titled in the other Debtors and spread among them.  *See* Appendix I.

The Affidavit of Barry Mankowitz in Support of First-Day Motions (First Mankowitz Affidavit) (Dkt. No. 8) provided the first day motions' evidentiary backbone.[5]  Mr. Mankowitz

---

[3] While CHI connects the Debtors as a substantive keystone, their affairs are apparently managed through CH Management.  *See* Confirmation Hearing Exhs. 6 and 13 (CH Exh. ___).

[4] The other two first day motions requested permission to use cash collateral (Dkt. No. 6) and to continue to use the existing cash management system, bank accounts and business forms (Dkt. No. 7).

[5] Mr. Mankowitz is the President of CHI and he manages the Debtors' combined operations.  Notably, the First Mankowitz Affidavit represents that all the Debtors are "tax exempt, non-profit" entities.  Yet, at the Confirmation Hearing, the evidence showed that only CHI has a 26 U.S.C. § 501(c)(3) charitable exemption.  Confirmation Hearing Transcript (Dkt. No. 720) at 49.  (CH Tr. ___).

affirmed that the Debtors' decades' long business model has been to provide housing for very low income tenants in Baltimore City.[6]  He also summarized the Debtors' history, management, functionality and the steep problems – higher operating costs due to the Debtors' aging rental units, slower rent increases in "mostly troubled neighborhoods" and "the growing volume of pending lead-related lawsuits" – that pushed the Debtors into Chapter 11.  (First Mankowitz Affid. at ¶16).  At Paragraphs 23 through 25 Mr. Mankowitz affirmed that:

> The [Debtors] have diligently strived to provide affordable and safe homes for their residents.  Nevertheless, in recent years, lead paint litigation suits brought by current and former tenants have dramatically escalated, and there are now more than 70 active cases against the [Debtors], and many more are anticipated.  This has increased the [Debtors'] legal expenses and contributed to operating losses.

> Furthermore, although the [Debtors] have liability insurance covering incidents of alleged exposure up to August 1999, since then, the [Debtors] (and to the best of their knowledge all other rental property owners in Baltimore) have been unable to obtain liability insurance that includes full lead-related coverage.

> The Maryland Court of Appeals, in its October 24, 2011 decision known as *Jackson v Dackman*, struck down the "immunity provision" in the state's lead law, the 1994 Reduction of Lead Risk in Housing Act, which had limited landlords' liability to $17,000 if they otherwise complied with the law.  This decision greatly increased the likelihood of additional lawsuits against the [Debtors] that allege exposure to lead substances, even though the [Debtors] continue to comply with the 1994 law.[7]

---

[6] The Debtors' dedication to housing for those who exist at, or below, the bottom rung of Baltimore's economic ladder is not surprising.  Peter Werwath, CHI's Chairman of the Board, testified at the Confirmation Hearing that the mustard seed that became the Debtors grew from the community spirited Enterprise Foundation (now known as Enterprise Community Partners), the brainchild of Maryland's prolific, legendary real estate developer, and positive social engineer, James W. Rouse.  CH Tr. at 68-71.

[7] *Jackson v. Dackman*, 30 A.3d 854 (Md. 2011), held that the limitation of landlords' lead paint poisoning liability to a mere $17,000 violated Article 19 of the Maryland Declaration of Rights.  Article 19 provides:

That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, according to the Law of the Land.

The creditor body reflects the prime cause for the Debtors' resort to bankruptcy. Four attorneys make up the Committee membership but the real parties-in-interest are their clients: Charles Blount, Brandon Foster, Demetre Quick and Lynell Watson, Mother and Next Friend of Robert Miller, a minor. *See* Proofs of Claim (POC) Nos. 2, 7 and 28, Dkt. No. 58 (Debtors' Schedule "F"), Dkt. No. 69 (Notice of Appointment of Creditors' Committee) and Dkt. No. 85 (Supplemental Appointment of Committee of Unsecured Creditors). Messrs. Blount, Foster and Quick, and Master Miller, are all lead paint claimants and plaintiffs in state court lead paint litigation that was pending prior to the Petition Date.[8]

The Debtors were initially represented by James A. Vidmar, Esquire of Yumkas, Vidmar & Sweeney, LLC (Vidmar Firm) (Dkt. No. 74).[9] A summary of the more or less significant matters managed by the Vidmar Firm during their approximately fifteen month tenure as Counsel follows:

> (a)  **Hiring Professionals** – Beyond the Vidmar Firm's own employment application, this category includes applications for the Debtors to employ the accounting firm of Snyder Gelblum & Sarid Chartered (Snyder Firm) (Dkt. No. 64)

---

Md. Const. Decl. of Rts. Art. 19. The Court of Appeals reasoned in part that, "[f]or a child who is found to be permanently brain damaged from ingesting lead paint, proximately caused by the landlord's negligence, the maximum amount of compensation [$17,000] under a qualified offer is miniscule. It is almost no compensation". *Dackman*, 30 A.3d at 868. Accordingly, the Court concluded, "when no adequate remedy is substituted for the [statutory] grant of immunity…the grant of immunity…leave[s] a negligently injured child without a remedy." *Id.* at 869.

[8] Kevin C. Maclay, Esquire, and his firm, Caplin & Drysdale, Chartered, are Counsel for the Committee (Dkt. No. 172). Of the fifty (50) POCs filed in this case, forty-three assert lead-paint based liability. All of those were filed by two attorneys (David Albright, Esquire and Evan Goldman, Esquire) on behalf of their plaintiff clients who had lead paint claims pending in the state court prior to the Petition Date. There are no POCs filed by *pro se* lead paint claimants. The 7 other POCs are (1) "preservation claims" filed by insurance companies (POC Nos. 17, 46, 47, 48 and 50, (2) a contribution claim (POC No. 1) filed by "Mildred Caplan t/h/o/u and t/u/o her insurers TBD", and (3) a claim for miscellaneous municipal charges (POC No. 49) filed by the City of Baltimore.

[9] The Vidmar Firm was paid $96,003.60 by the Debtors for pre-petition services apparently rendered not so many months before the Petition Date. The Vidmar Firm then received a $100,000 retainer for representation in this case (Dkt. No. 4).

and Semmes, Bowen & Semmes, P.C. (Semmes Firm) as Special Insurance Counsel (Dkt. No. 63). The employment of the Snyder Firm was approved without objection but because the Semmes Firm – the Debtors' long time, pre-petition, insurance counsel employed to champion the Debtors' interests with respect to the existence, quality and scope of their insurance coverage – held a fairly obvious, potential conflict of interest, the matter had to be summarily litigated (Dkt. Nos. 91 and 92). [10] The dispute was eventually resolved with the Semmes Firm's employment made subject to conditions agreed to by the parties and others imposed by the Court.

(b)     **Defense of Motions to Lift the Automatic Stay** – On November 22, 2013, Martieze Brockington, through the firm of Goldman & Goldman, P.A., filed a motion to lift the automatic stay in order to allow the completion of her lead paint litigation pending in the state court (Dkt. No. 115). A flood of like motions (Lift Stay Motions) followed, seeking the same relief for other, similarly situated lead paint plaintiffs. The gist of each was that (1) the Debtors had insurance coverage for the asserted claims, (2) the state court would be a far better forum than this Court to resolve the liability issues (all governed by Maryland law) and (3) if the stay was modified and they were allowed to proceed, the plaintiffs would not seek to enforce (outside of this case) any resulting judgments against the Debtors. The Debtors opposed the Lift Stay Motions and the Oversigned denied them by way of an oral ruling at the January 10, 2014 hearing (Dkt. No. 270) that was then memorialized by an Order entered on January 22, 2014 (Dkt. No. 279). The Court's reasoning was that the entire purpose of the then only four months old bankruptcy case was to "effectively manage lead paint claims, including future claims, in a single forum" and that it would lead to anarchy to re-ignite the state court litigation before the Debtor had a reasonable opportunity to reorganize. [11]

---

[10] Both the Committee and the UST filed objections to the Semmes Firm's employment because of their ongoing representation of PRO-IS, Inc., an insurance claims administrator that also performs services for the Debtors' insurers.

[11] It is singularly ironic that two years later, the Final Plan proposes to do exactly what the Movants desired to accomplish through the Lift Stay Motions − lift the stay and allow the prepetition litigation to proceed unabated. This is so in part because any liability, costs and attorney's fees will likely be either covered, or paid for, by insurance.

(c)    **Defense of the Committee's Motion to Examine the Debtors' Insurance Policy Library** – The Committee's motion (Dkt. No. 203) was grounded upon the simple premise that the Committee had the right to investigate and analyze documents in the Debtors' possession relevant to the Debtors' entitlement to insurance coverage for lead paint claims, described by the Debtors as the foundation of the "substantial assets" of the estate.  Although the Committee's right to so examine would seem to be incontestable both as a matter of common sense and Bankruptcy Rule 2004, the Motion was necessitated by the Debtors' apparent refusal to voluntarily produce the documents.  The Debtors did indeed formally oppose the Committee's request and that, in part, led to a February 28, 2014 hearing (Dkt. No. 295) the upshot of which was the Debtors' agreement to produce all the requested documents (Dkt. No. 299).

(d)    **The Extension of the Automatic Stay to Mr. Mankowitz** – On October 25, 2013, a little over a month into the case, the Debtors filed a complaint to extend the automatic stay and for injunctive relief (Extension Complaint) (Dkt. No. 77).  The goal was to bring Mr. Mankowitz within this Court's jurisdictional shelter and freeze the pending state court lead-paint litigation against him.[12]  The Debtors

---

[12] The legal theory that underlies stay extension to persons not in bankruptcy derives from principles laid down in *A.H. Robins v. Piccinin*, 788 F.2d 994 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S. Ct. 251, 93 L.Ed.2d 177 (1986) and other like cases.  These principles also provide the blueprint for including non-debtor releases and injunctive relief in confirmed Chapter 11 plans.  *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 701-02 (4th Cir. 1989).  The allegations included in Paragraphs 19 through 23 of the Extension Complaint are noteworthy as a backdrop to the questions addressed in this Opinion:

19.    Some of the Prepetition Proceedings have a defense and indemnity provided for pursuant to liability insurance while others have no insurance coverage available and are being defended by and at the expense of the Debtors.

20.    There is no liability insurance available for many claims for occurrences that arise subsequent to August 1999.

21.    The liability insurance policies of the Debtors and potential indemnity proceeds thereof are substantial assets of the bankruptcy estates which may be diminished as policy limits are eroded and/or exhausted.

22.    There is potential liability for future claims that arise on or about September 10, 2013, the Petition date through a period twenty-one years from that date.

summarized the crucial role anticipated for Mr. Mankowitz
in the reorganization process and alleged that the stay
should be extended to protect him from the distraction of
litigation and the potential hardship of personal liability
while the reorganization unfolds.  The Extension Complaint
was resolved by a consent order (Dkt. No. 329) entered on
June 6, 2014 that extended the stay to Mr. Mankowitz as if
he were one of the Debtors.

(e)    **Motions to the Extend the Exclusive Periods** – From
December 23, 2013 to September 29, 2014, the Vidmar
Firm filed four motions (Dkt. Nos. 231, 311, 347 and 381)
to extend the Debtors' 11 U.S.C. § 1121(b)'s[13] exclusive
period to file, and gain acceptances of, a plan.  Each
subsequent motion repeated the grounds alleged in the first,
that: the Debtors' cases are complex, "with lead paint
claims and insurance coverage issues"; the Debtors were
negotiating the sale of certain assets, the extent of their
insurance coverage, the restructuring of their existing
financing arrangements and the contents of their plan; the
Debtors were acting in good faith, and; the Debtors had
made substantial progress while under the Court's
protection.

All of the Debtors' requests to extend the exclusive periods were granted, a few by

consent.  However, at some point the Debtors' management became disenchanted and the

Vidmar Firm's employment was terminated.  That change in direction is first reflected on the

Docket by the Application for an Order Authorizing the Retention and Employment of Cole,

Schotz, Meisel, Forman & Leonard, P.A. (Cole, Schotz),[14] as Substitute Bankruptcy Counsel for

---

23.    There are known and potentially unknown claimants that have resided
in some or all of the 327 rental units owned by the Debtors.

(Extension Compl. at ¶¶ 19-23).  In one way or another, each of the above acknowledgements, now enhanced by the
evidence offered at the Confirmation Hearing, bear upon the grant or denial of the Release.

[13] Unless otherwise noted, all statutory citations are to the Bankruptcy Code (Code), found at Title 11 of the United
States Code.

[14] Irving E. Walker, Esquire of Cole, Schotz has been, and still is, Debtors' Lead Counsel.

the Debtors (Dkt. No. 451) filed on December 22, 2014.  A $100,000 retainer was requested

along with the approval of the Vidmar Firm's continued "aid", meaning in essence that the

Debtors would have *two sets* of general bankruptcy counsel for an open-ended period of time to

"ensure a smooth transition".[15]  Not surprisingly, on January 8, 2015, the Committee objected

(Dkt. No. 469).  The Objection was primarily grounded upon the notion that a change in

Counsel, with an indefinite, "dual-counsel" transition period, could upend the Debtor's fiduciary

responsibility to lead paint claimants in a variety of ways.  Nevertheless, the Application and

Objection were resolved by consent (Dkt. No. 485) on February 23, 2015 with terms governing

(1) the timetable for drafting a plan, (2) a proposed confirmation schedule, (3) the payment of

approved but unpaid professional fees and (4) a thirty (30) day time limit on the transition

period.

      *(b)*     *The Pre-Confirmation Hearing Process*

      On May 27, 2015, the Plan Proponents filed their Chapter 11 Plan Jointly Proposed by

the Debtors and the Official Committee of Unsecured Creditors (First Plan) (Dkt. No. 508).  The

First Plan included six key provisions:

      (1)     The merger of non-debtor affiliates (Affiliates) into CHI;[16]

      (2)     The managed liquidation of all real estate owned by the Debtors and the
                    Affiliates;[17]

---

[15] Cole, Schotz indicated in support of their employment that as of the date of its filing, the Vidmar Firm had billed
the Debtors $583,423.67 (including $110,559.60 paid for pre-petition services) of which $521,775.08 had been paid
(Dkt. No. 475).

[16] As defined in the Final Plan, the Affiliates are City Homes Central I Business Trust, City Homes Central II
Business Trust, City Homes Central III Business Trust, City Homes Central IV Business Trust, City Homes Central
V Business Trust, City Homes Office Business Trust, City Homes Patriots I LLC, City Homes Patriots III LLC, City
Homes Patriots IV LLC, City Homes Patriots V LLC, and City Homes Central I, LLC.  Apparently, the Affiliates
are not vexed by the presence of lead paint and did not have to file bankruptcy.  CH Tr. at 52.  Yet, they all appear to
have the same nexus of ownership and control with CHI as do the other Debtors.  *See* CH Exh. 6.

[17] The improved real estate owned by the Affiliates is identified in Appendix II.

(3)     The resumption of state court lead paint litigation by lead paint claimants who are covered by insurance (Insurance Covered Claimants) with fees, costs and any judgments to be satisfied by resort to insurance proceeds;

(4)     The creation of a repository for the Debtors' corporate records related to lead paint claims;

(5)     The creation of a fund of no more than $300,000 for Uninsured Claimants (and those Insurance Covered Claimants who select easier, faster payment over litigation) to be distributed *pro rata* to allowed claims filed within a year; and

(6)     The Release, for the benefit of the Protected Parties who will continue on after confirmation as either unpaid Directors of CHI or salaried employers of CH Management, and who (for employees) will receive severance pay when operations cease.

These essential elements have not changed through each subsequent iteration of the First Plan.[18]  Also filed on May 27th was a Disclosure Statement Accompanying Chapter 11 Plan Jointly Proposed by the Debtors and the Official Committee of Unsecured Creditors (First Disclosure Statement) (Dkt. No. 509).  The Debtors also filed that day a Motion to Approve (I) Disclosure Statement Accompanying Chapter 11 Plan Jointly Proposed by the Debtors and the Official Committee of Unsecured Creditors and (II) Voting, Solicitation and Notice Procedures (Approval Motion) (Dkt. No. 510).  Among other things, the Approval Motion specifically sought the approval of the utilization of notice by publication of the First Plan for existing and former tenants who were not actively represented by counsel in this case and the use of Master Ballots for plan voting to be executed and filed by attorneys on behalf of the group of lead paint claimants they represent.

The Approval Motion's proposed order had several exhibits attached and each was intended to breathe life into the Plan Proponents' confirmation tactics.  *See* Dkt. No. 510 at

---

[18] In the Final Plan, the claims filing deadline for the $300,000 Uninsured Claimant fund was extended to two years and Mr. Mankowitz will donate his approximately $95,000 severance pay expectancy to the $300,000 fund.

Exhibit 2 (Proposed Order).  Somewhat relevant to the legitimacy of the Release is Exhibit F, which sets forth the proposed Plan Publication Notice and the proposed Lead-Paint Claim Publication Notice.  The Plan Publication Notice provides:

> [CHI] and certain of its affiliates … are in bankruptcy.  If you reside or resided in a City Homes property in Baltimore City, you may have a claim against City Homes related to lead-paint exposure.  City Homes has proposed a bankruptcy plan that, if approved by the bankruptcy court, will limit your right to file suit against City Homes and others. You may be eligible to submit a vote under the plan or object to confirmation of the plan.

The Lead-Paint Claim Publication Notice read, "City Homes current and former tenants – you may have a right to recover for lead-paint exposure.  For information, call _____ or visit www._____."[19]

The Order and Notice for Hearing on Disclosure Statement (First DS Order) (Dkt. No. 511) was entered on May 29, 2015.  July 8, 2015 was fixed as the date for the First Disclosure Statement hearing with objections to be filed by July 2, 2015.  Pennsylvania National Mutual Casualty Insurance Company (Penn National), one of the Debtors' insurers, filed an Objection (Dkt. No. 526) on July 1, 2015.  Penn National averred that, (1) the First Plan had to be "insurance neutral", meaning that it could not alter, or impact upon, the terms of the insurance contract between Penn National and the Debtors and (2) in order for the First Disclosure Statement to provide adequate information, it had to acknowledge the potential risk that insurance coverage might be voided if the First Plan violated that principle.[20]  In an effort to

---

[19] The Plan Publication Notice was used during the run-up to the Confirmation Hearing to constructively publicize the confirmation proceedings and a right, if any, to either vote upon, or object to, confirmation while the Lead Paint Claim Publication Notice was to be used after confirmation to constructively publicize notice of the opportunity to file a claim under Article 4.5 of the First Plan.

[20] Continental Insurance Company also filed an Objection (Dkt. No. 528) to the First Disclosure Statement on July 2, 2015.  It averred that the Debtors had a duty to explain how their pre-bankruptcy settlement agreements with insurers would be treated under the First Plan.

resolve the two objections (and apparently in the wake of negotiations with the objectors) the
Plan Proponents filed their First Amended Chapter 11 Plan Jointly Proposed (Amended Plan)
(Dkt. No. 535) and First Amended Disclosure Statement (Amended DS) on July 7, 2015, the eve
of the hearing.[21]

The Debtors approached the hearing with urgency.  Mr. Walker expressed the hope that
"as much as possible" could be resolved that day, which the Court understood to mean at a
minimum the approval of the Amended DS and grant of the Approval Motion that very day.
However, the Oversigned concluded it would not be prudent, nor in the overall interest of justice,
to rush the proceedings to conclusion in light of the rights at stake.  This was especially so when
one considers that the Amended DS had only been filed the night before and general notice of its
alterations had not been provided to creditors or parties in interest.  Hence, three main questions
were addressed at the hearing: (1) the sufficiency, as a matter of due process, of the proposed
publication notice for former, or "unknown" tenants (Unknown Tenants), (2) whether the
Amended Plan and Amended DS cured the objections raised by the insurance companies, and (3)
whether the Amended DS included adequate financial information of the Debtors' affairs.
Regarding the first category, the Debtors emphasized that they had no business records,
forwarding addresses or other means of contacting Unknown Tenants and that the Debtors'
proposed notice methodology – targeted media advertising of various types – would be the best
(and perhaps only) effective means of giving Unknown Tenants notice of the First Amended
Plan.  To that end, a significant portion of the hearing was devoted to the testimony of Ms. Carol
Ronis, the Debtors' media specialist.  At the close of the hearing, the Court (a) urged the Debtors
to broaden their notification strategy and (b) indicated that a written ruling on the First Amended

---

[21] Because the Amended DS was filed, an Order denying the Approval Motion as moot was entered on July 7, 2015.

13

DS would be entered within three weeks.  Two days later, the Debtors filed an Amended

Approval Motion (Dkt. No. 550).  The Amended Approval Motion sought the same fundamental

relief as the original but also explained why, in several areas, and contrary to the Court's wishes,

the Debtors thought it best to limit, rather than expand, the scope of publication notice.

On August 3, 2015, the Court entered its Order Denying Approval of Disclosure

Statement without Prejudice (Order Denying DS) (Dkt. No. 567).  The Order Denying DS noted

the Court's independent duty, whether objections are raised or not, to evaluate the caliber of

information provided in a disclosure statement in order to determine whether a plan *prima facie*

qualifies under the mandatory confirmation provisions of Section 1129(a).  One of those vital

questions is feasibility and the Amended DS's lack of objective evidence regarding the value of

the Debtors' real estate provided an important reason for concern.  Likewise, even if the real

estate value estimates were accepted, they indicated that the proposed liquidation would likely

not pay lienholders in full, leaving no equity to fund the Plan.  Moreover, the First Amended DS

was fatally flawed by its failure to include any description at all of the assets, especially the real

estate assets, to be gained through the merger of the Affiliates into CHI.  And above all, the

Amended DS did not provide any explanation as to why the Protected Parties should be entitled

to the Release.

The Order Denying DS gave the Plan Proponents sixty (60) days to file an amended

disclosure statement.  Before the expiration of that deadline however, on August 19, 2015, the

Debtors filed a Supplement to the Amended Approval Motion (Supplement) (Dkt. No. 579).  In

it, the Debtors acknowledged that crucial misstatements had been made at the July 8th Hearing.

In relevant part, the Supplement stated:

After conferring with the Debtors following the Hearing, counsel for the Debtors learned that the Debtors may have some information regarding forwarding addresses for approximately 10% of former tenants.

The Debtors estimate that it will take approximately 20 man-hours to look for and to determine what forwarding addresses they may have for former tenants in the past two years alone, without including any time to determine whether any such address information is still valid. The Debtors determine it would take over 200 man-hours to determine what forwarding addresses they may have for all former tenants, excluding any time to determine if any such address information is still valid.

*      *      *

In the present cases, the Debtors propose in the Amended Motion to perform a review of their records to provide the Confirmation Hearing Notice to all former tenants who lived in one of the Debtors' properties in the past *two years* and for whom the Debtors have a forwarding address.

Under the circumstances, the Debtors believe that a review of the files for former tenants over the past two years is a reasonable search to identify unknown claimants. First, the Debtors will not have many forwarding addresses for former tenants beyond the past two years. Second, many of the former tenants who provided a forwarding address over two years ago may have moved to yet another address. *Third, while the proposed review will be burdensome enough on the Debtors' small staff, requiring more would be impracticable and unduly burdensome, without any reason to think that the additional burdens would result in finding a material number of valid and current addresses for former tenants.*[22]

(Supplement ¶¶ 4-5, 12-13) (emphasis added, footnote omitted).

The conclusions expressed and actions proposed in the Supplement were based solely

upon the Affidavit of Mr. Mankowitz (Second Mankowitz Affidavit) attached to the Supplement

---

[22] The Debtors' footnote to this paragraph explains that former tenants who are defined as Lead Paint Claimants will have solicitation packages sent directly to the lawyers who represent them.

as Exhibit A.  The Second Mankowitz Affidavit is terse, and neither explains why incorrect information was provided in the first instance nor how the new information came to light.

On September 2, 2015, the Plan Proponents filed their Second Amended Disclosure Accompanying First Amended Chapter 11 Plan Jointly Proposed (Second Amended DS) (Dkt. No. 586) and a Second Amended Chapter 11 Plan (Second Amended Plan) (Dkt. No. 585).  On September 24, 2015, the Court entered the Order Approving Second Amended Disclosure Statement (Order Approving Second Amended DS) (Dkt. No. 594).  The Order Approving Second Amended DS indicated that the Second Amended DS "substantially" complied with the requirements of the Order Denying DS.[23]  However, it also provided that,

> it would be in the interests of justice to hold a further evidentiary hearing upon the Amended [Approval] Motion and Supplement for purposes of examining the adequacy of notice proposed to be given to former tenants of the Debtors pursuant to the standards set forth in *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) and *In re J.A. Jones, Inc.*, 492 F. 3d 242 (4th Cir. 2007) in light of the disclosure in the Amended [Approval] Motion that the Debtors do have some degree of forwarding contact information for that class of potential claimants and in order to insure that the nature and quality of the notice given is appropriate to the circumstances in light of the information included in the Debtors' relevant books and records....

The evidentiary hearing went forward on October 26, 2015.  Excerpts of the Court's opening observations and the colloquy between the Court and Mr. Walker follow:[24]

> THE COURT:  …[w]hen we had the other hearing, and we were talking about notice,… it was mentioned that in terms of … former

---

[23] Although full compliance was lacking, the Oversigned concluded that any remaining defects could be addressed (and relevant evidence elicited) at either the evidentiary hearing required by the Order Approving Second Amended DS or the Confirmation Hearing.

[24] From this point on, lengthy quotations from the transcripts are included to give the reader a meaningful understanding of the hearings' substance.  I conclude that the absence of an adversarial framework, my decision to impose my equitable conscience in favor of the Uninsured Claimants and the admonition included in *NHF I* that specificity is to be prized, justify the length.

tenants who had lived in the debtor's premises, that either counsel said it or Mr. Mankowitz testifying or some combination of that, indicated that it was impossible to get in touch with those people; that that would be futile…

Now that didn't sound like it really made sense to me, but I don't have any evidence to the contrary to go on.  And you know, you assume that that's accurate at that point in time. And of course there aren't any attorneys out there representing this group.  The assumption is, is that they're not a part of the group that has already filed suit, one way or another, against the debtor or perhaps even filed claims in the bankruptcy case, *et cetera*.

So then the question is, whether they are so-called unknown creditors or known creditors.  And depending upon that characterization, which prong of the *Mullane* case, the Supreme Court case, do they fall under.

* * *

But … I think the *Jones* case probably, as a practical matter, lays it out in a way that equally applies more recent, straight forward language, especially in light of that particular circumstance.  So that was 492 F. 3d at 242.  And I'm going to read from 249, because I think this just sets up the question.[25]

It says, "The type of notice that is reasonable or adequate for purposes of satisfying the due process requirement in this context depends on whether a particular creditor is known or unknown to the debtor.

In this regard, to achieve a constitutionally permissible discharge of a known creditor's claim against a debtor, actual notice of the bankruptcy filing, and applicable bar date is required."  That's a known creditor.  "By contrast, where a creditor is unknown to the debtor, constructive notice, typically in the form of publication, is generally sufficient to pass constitutional muster.

"An unknown creditor, ie., [sic] one who is not entitled to actual notice of the debtor's bankruptcy filing, is a claimant whose identity or claim is wholly conjectural or quote, 'whose interests are or whereabouts could not, with due diligence be ascertained,' end quote, by the debtor."

---

[25] *Zurich Am. Ins. Co. v. Tessler (In re J. A. Jones, Inc.),* 492 F.3d 242 (4th Cir. 2007).

Known creditors, in contrast, include claimants whose identities are actually known to the debtor, as well as claimants whose identities are reasonably ascertainable to the debtor…. And in this regard the Supreme Court has made clear that a creditor is reasonably ascertainable if the debtor can uncover the identity of that creditor through reasonably diligent efforts.

In this regard, reasonable diligence by the debtor in attempting to ascertain the identity of its creditor does not require, quote 'impracticable and extended searches in the name of due process.' Put differently, what is required is not a vast open-ended investigation."

Instead -- and this is citing from *Chemetron*, 72 F.3d at 347. "Instead the requisite search focuses on the debtor's own books and records.[26] Efforts beyond a careful examination of these documents are generally not required. Only those claimants who identifiable through a diligent search are reasonably ascertainable and hence known creditors."

*        *        *

And so I recognize, in our situation, that just because someone lived without [sic] the premises of City Homes, just because somebody was a tenant there doesn't necessarily mean that they are a creditor. It doesn't mean that there's liability.

But I don't think that really matters, in light of the Court's holding in the *Jones* case. And in light of what I really get from the Supreme Court opinion.

[The Supreme Court said] if you have information regarding those creditors, those potential creditors, those potential claimants, parties that are entitled to notice and an opportunity to be heard in your books and records, then it says, "Where the names and post office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency."

[Debtor's past-hearing filing] seemed to say that, yes, there was information within the books and records of the debtor, the various affiliates, all of whom have sought Chapter 11 relief, and the debtor seemed to be suggesting, well, it would cost too much

---

[26] *Chemetron Corp. v. Jones*, 72 F.3d 341 (3d Cir. 1995).

money for us to get in touch with people beyond a two-year period, *et cetera*, and that's really not fair to the debtor.  I don't think that's what these cases say.

So I guess the simple resolution is to say if you have contact information for any former tenant who was – who lived in the premises, then that notice of the case, notice of what's going on at this point, notice of an opportunity to file claim, whatever the specific notice is, should be sent to those people.

*       *       *

MR. WALKER:  The debtors would respectfully ask the Court to consider the broader case law that not only includes *Mullane* and *J.A. Jones*, but other cases I'll mention, including other Supreme Court precedent, which in our view, Your Honor, makes clear that the mere fact that a debtor knows that somebody potentially might have a foreseeable claim does not make them a known claimant, unless the debtor knows the identity of the claimant and knows that they have been injured.  And that includes somebody who may assert a claim, but the debtor does not think it's valid.

And we believe, Your Honor --

THE COURT:  All right.  Well we can do that, Mr. Walker, but if people come in here, after confirmation, and ask me to turn out the confirmation order, then that's what I'm going to do.  If the debtor had knowledge of them in their books and records, and they didn't give them notice, then that's exactly what I'm going to do.  So I'll tell you that right now, and I'll put that in the confirmation order.

And I hate to get exercised about it, but we're talking about people who may have suffered lead paint poisoning --

*       *       *

MR. WALKER:  The debtors don't view it as material whether the debtors think a claim is valid or baseless.  We would view anyone who we know has a claim, if we believe it's baseless, to be a creditor entitled to actual notice, if the debtor knows about the claim and knows about the whereabouts of the claimant.

With Your Honor's permission, I would just like to give two concrete examples recognized by Supreme Court and appellate

case law that to me demonstrates the reasonableness of our position.

One case, Your Honor, I have copies of the opinions here if Your Honor wants me to hand them up, one case is the Fifth Circuit case of *Placid Oil*, a 2014 decision of the Fifth Circuit.

*       *       *

. . . [W]hat the Fifth Circuit had to consider in that case was what happens if the debtor did not know that, in this case, a claimant was family members of a deceased former employee or actually a family member who was injured by laundering the clothes of the deceased employee.  Was that --

THE COURT:  Why do you not want to give notice?

MR. WALKER:  Your Honor --

THE COURT:  What's the benefit for the debtor?  What's going on behind the scenes that I'm not seeing?  What's going on beneath the tip of the iceberg that would make the debtor say, it makes more sense for me not to give notice to these former tenants, rather than mail them notice and do what Judge Gordon wants me to do to make sure that they have prompt and specific notice rather than putting some ad in the Baltimore Sun?  Why is that a better idea?

MR. WALKER:  Your Honor, first of all, I want to be very strong in the debtor is not looking to, you know, get away with anything.

THE COURT:  Then why?  Tell me why.

MR. WALKER:  The debtor is a small organization that, as Mr. Mankowitz's affidavit said, in order to go back into old records, I don't know -- we've already gone back two years, and as his affidavit indicated -- and you will hear from Mr. Mankowitz, the estimate was it would take about 20 hours to go back two years.

*       *       *

Approval Motion Hearing Transcript (Dkt. No. 719) at 6-15 (emphasis added) (AMH Tr. ____).

The Debtors then called Mr. Mankowitz to testify.

20

Q (MR. WALKER): Since the last hearing before this Court on July 8th, what did you have your staff do, in terms of looking back in former tenant files to see whether you could find forwarding addresses for any of the tenant [sic]?

A:  Well, what we did, we went back two full years.

Q:  And approximately how many addresses did you obtain in that search?

A:  We obtained 16 per year, as a total of 32 -- approximately 16, average, total of 32 in two years.

Q:  About how many working hours did it take your staff to dig that information out?

A:  Twenty.

Q:  And in your estimation, how many working hours for your staff would it take to go back to 1987[27] in order to find forwarding -- to see if there was any forwarding addresses in the older files?

A:  Well I just took -- went back 20 years because I know it's the statute of limitations, so I just took 20 years times the … ten hours a year so 10 times 20 would be 200 man hours, just to go back 20 years.

Q:  And do the debtors have sufficient staff to search all the files in the way that would require the search of all files in the last 20 years?

A:  The answer would be no, because when we set our company up, it was to operate on a very lean way.  So in other words, there's no extra staff there that has time to do anything like that. Everybody has a certain job to do and they're kept busy the full eight hours a day.

Q:  Now the Court has expressed a very strong concern about the tenants, or former tenants who don't get a mailed notice.  What is your opinion and belief and information concerning former tenants' knowledge about lead paint issues and a potential of having a claim from lead paint issues?

---

[27] Because Mr. Walker is using a 20 year look back period as the outer limit of inquiry, the referenced date must be 1997.

21

A:  Well, Your Honor, when … we rent to a tenant, they come to our office to rent, we show them a videotape.  On the videotape it describes the dangers of lead paint poisoning, it shows them what to do, as far as taking care of the property, it tells them to call the rental office if they have any chipping or peeling paint.

Each tenant is provided a mop, a bucket, TSP, sponge and rubber gloves, that's to clean the dust so the house will be safe.  So every tenant knows exactly the dangers of lead paint, and they also are well aware of lead paint in the property.

Also, at the time of orientation we give them a pamphlet from the EPA which describes, again, all the rigors of lead paint, what the problems are.  And my honest belief is that every – I know for a fact every tenant that rents from City Homes and has rented from us since 1987, are well aware of lead paint.

*       *       *

THE COURT:  …So in your own mind, how would that mitigate what might otherwise be a responsibility to let former tenants know about this bankruptcy case?

MR. MANKOWITZ:  Well Your Honor, being in Baltimore for so many years, and I know for a fact that counsel, lawyers for lead paint plaintiffs advertise continuously, and they advertise by blanket mailings, they advertise on billboards and they advertise on television.  I can't, for the life of me, understand anybody that would live in Baltimore, in a low income property, that wouldn't understand about lead paint, lead paint suits and who to go to.  And my belief is that they would know already, without me looking, spending 200 man hours to send them a letter.

Now, if I send them a letter, it's no guarantee they're still at the same property, because we know by the amount of turnovers we have, that those people that moved out, families, in two years they might be at a completely different address.  So the mail wouldn't follow them, necessarily.  Because I know when I do certain mailings in our own office, that they come back and -- for one reason or another, it's not delivered, they could have moved and/or the postman, for some reason, think the house is vacant.

But I believe to myself that everybody in the city, in low income housing, knows about these lead paint suits, they read about it in

the paper and these attorneys are continuously blanket mailing and television ads trying to get them as clients.

* * *

THE COURT:  Okay.  How much is it going to cost you? How much is it going to cost the debtors if I was to order the debtors to put in the 200 man-hours, or something less than that?  I mean, from what I'm understanding, you're telling me that you really didn't keep forwarding addresses until 2010.  You really didn't try to keep forwarding addresses, and then it was dependent upon whether or not the debtor [sic] was willing to give you the information or not, right?

MR. MANKOWITZ:  That's correct, Your Honor....

* * *

THE COURT:  So going back from 2015 to 2010, how much is that going to cost you?

MR. MANKOWITZ:  Beg your pardon, Your Honor?

THE COURT:  How much would that cost you?  You're talking in terms of -- what I'm understanding is, you're saying, you have a small staff and everybody has a job to do and they do their jobs. So for you to say, look, Joe, Frank and Sally, I want you to go back through the files and find forwarding address, that that's going to be somehow prejudicial to you or prohibitive, or I shouldn't make you do it because it's fair [sic].[28]  That's what I'm hearing.

So what I'm trying to get an idea of, how much is it going to cost. And if it's not going to cost anything, then I want you to tell me that.  If it is going to cost you something, I want you to tell me that, too.

* * *

MR. MANKOWITZ:  So the answer for your question is, it wouldn't cost anything, but we -- I don't know how we would do it, but we would just have to do it.

* * *

---

[28] The transcript should read "it's not fair".

THE COURT:  All right.  How do you know, Mr. – just tell me, I want your best, most honest answer.  Are you confident that earlier than 2010 you're not going to find any worthwhile or useful contact information with respect to former tenants?

MR. MANKOWITZ:  I can't honestly say that, Your Honor.

*        *        *

MR. MANKOWITZ:  I think I'm still getting back to the same thing, as I -- as my belief is that the families that moved would know about going to a counselor, going to an attorney and getting a lead -- a suit.

THE COURT:  Well, I understand that, but that doesn't mean --

MR. MANKOWITZ:  Um hmm.

THE COURT:  -- that these folks know specifically about this bankruptcy case, and that's my concern.

MR. MANKOWITZ:  I understand.

AMH Tr. at 22-32.

The Order Approving Voting, Solicitation and Notice Procedures in Connection with Confirmation (Voting, Solicitation and Notice Order) (Dkt. No. 629) was entered in the wake of that hearing.  The Court reluctantly decided to limit the look back period for forwarding addresses to only five years.  The Voting, Solicitation and Notice Order provided in relevant part that notice of the confirmation hearing would, "be sent by first-class mail to (a) all current tenants of all properties owned by the Debtors, and (b) all former tenants who lived at one of the properties owned by the Debtors at any time during the past five (5) years prior to the September 10, 2013 filing of these bankruptcy cases, for whom the Debtors have a forwarding address in their books and records...."  (Voting, Solicitation and Notice Order ¶ 11).  The Confirmation

Hearing was scheduled for January 25, 2016 at 11:00 a.m.  What follows is a list of filings made in anticipation of that hearing:

a. Stipulation and Consent Order Extending Time to Object to Second Amended Chapter 11 Plan Jointly Proposed by the Debtors and the Official Committee of Unsecured Creditors (Dkt. No. 671) which extended until January 8, 2016 the deadline for CX Reinsurance Company LTD. f/k/a CNA Reinsurance Company LTD to object to the Second Amended Plan;

b. Stipulation and Consent Order Extending Time for the Office of the United States Trustee to Object to the Second Amended Chapter 11 Plan Jointly Proposed by the Debtors and the Official Committee of Unsecured Creditors (Dkt. No. 673) which extended until January 11, 2016 the deadline for the UST to object to the Second Amended Plan;

c. Objection of Penn National to Second Amended Chapter 11 Plan Jointly Proposed by the Debtors and the Official Committee of Unsecured Creditors (Dkt. No. 675);

d. Application for an Order Authorizing the Retention and Employment of Paul R. Cooper as Expert Witness for Plan Confirmation Hearing, *Nunc Pro Tunc* to January 5, 2016 (Dkt. No. 680) filed on January 5, 2016 by the Debtors to authorize the hiring of the proposed Plan Sales Agent as an expert witness on the sale price projections for the real estate that the Plan Proponents intended to liquidate under the Second Amended Plan;

e. Debtors' Memorandum in Support of Confirmation of Chapter 11 Plan Jointly Proposed by the Debtors and the Official Committee of Unsecured Creditors (Dkt. No. 681), a forty-one page Opus on why confirmation, and the approval of the Release, would be in the best interest of all concerned, filed on January 6, 2016;

f. A Second Amended Chapter 11 Plan Jointly Proposed by the Debtors and the Official Committee of Unsecured Creditors (Modified) (Modified Plan) (Dkt. No. 685) filed

on January 13, 2016 and accompanied by a "Blacklined" version of the same at Dkt. No. 686;[29]

g.    A Tally of Ballots (Dkt. No. 690) filed on January 14, 2016 that reports the voting results on the Modified Plan;

h.    A Notice of Withdrawal (Dkt. No. 695) of Penn National's Objection to the Second Amended Plan filed on January 18, 2016;

i.    A Line Submitting Affidavit of Carol Ronis in Support of Confirmation of the Modified Plan (Dkt. No. 697) filed on January 19, 2016;

j.    The Official Committee of Unsecured Creditors' Statement in Support of Confirmation of Chapter 11 Plan Jointly Administered by the Debtors and the Official Committee of Unsecured Creditors (Dkt. No. 700) filed on January 21, 2016.[30]

Because a massive blizzard was bearing down upon the Mid-Atlantic region days before the Confirmation Hearing, Mr. Walker contacted the Oversigned's Chambers and requested that the Confirmation Hearing be moved from Monday, January 25th to Tuesday, January 26th. The request was granted (Dkt. No. 699). However, the blizzard was sizable enough to close the Courthouse for several days and hence the Confirmation Hearing was rescheduled for February 23, 2016.[31] The hearing commenced that day.

---

[29] Modifications were made to Articles 4.4 (Classes 4A-L-Other Unsecured Claims), 4.5 (Class 5A-L – Lead-Paint Claims), 5.6 (Actions against the Debtors, Reorganized Debtors and Lead-Paint Insurance Entities to Obtain Benefits of the Lead-Paint Insurance Coverage), 7.1 (Executory Contracts and Unexpired Leases). The modifications all appear calculated to appease Penn National and resolve its objections.

[30] Mr. Karl Crosby filed an objection (very loosely interpreted) to confirmation (Dkt. No. 683) that was more of a screed against the Debtors than a proper court filing. The Debtors responded at Dkt. No. 674 and requested that Mr. Crosby's letter be expunged.

[31] Mr. Walker's initial request combined with the events that followed as the snow continued to fall, deeply troubled the Oversigned. Shifting the hearing by a day with the hope that the effects of the blizzard would be less impactful than predicted may seem a small thing. But it was virtually certain that notice of the change in date forwarded in the midst of a serious weather event by regular mail the Friday before the Tuesday hearing would be ineffectual and no real notice at all for those who rely on notice through the United States Postal Service. Nevertheless, the brief continuance was granted. Frankly, for that reason the Oversigned was relieved when the blizzard's accumulation

(c)     *The Confirmation Hearing*

**1.     <u>The Opening Debate as to the Proposed Release.</u>**

Stripped to its raw essence, the Modified Plan[32] is a relatively simple, liquidating plan.

Normally, it would be hard for a liquidating plan's sponsor to lose a confirmation hearing.

However, the Plan Proponents' decision to wrap the Release inside the Modified Plan made this

liquidating Confirmation Hearing anything but normal.  To get to the nub of it, the vital, burning

questions were (and remain), (a) whether the Release satisfied the criteria established in *NHF I*

and applied in *NHF II* and (b) whether the Modified Plan could be confirmed with the Release.

In this context, Mr. Walker opened the hearing by stating:

> All creditors and other parties who have an interest at stake in this
> case have expressed their support for confirmation.  Your Honor,
> in my personal experience in all of the Chapter 11 cases I've been
> in with a sizeable amount of creditors, I've never, until this case,
> been in a Chapter 11 case where every single voting creditor voted
> to accept in support of the plan.  I believe that is a very strong
> indication that the plan was formulated in a way that serves the
> best interests of all creditor [sic] and the estates.
>
> The few objections, formal and informal, that previously had been
> expressed during the process leading up to today, were fully
> resolved, as reflected in the court docket.  And therefore, we stand
> before Your Honor today with no objection, *and there is no contest
> to the plan*.
>
> *         *         *
>
> I think it's noteworthy that we stand before the court today with no
> objection from the office of the United States Trustee [to the
> Release].  I think Your Honor knows we have a very vigilant US
> Trustee's office here, and once they learned the *extraordinary facts*

---

proved to be substantial enough to close the Courthouse on both January days.  However, my discomfort multiplied exponentially when I learned on the night of January 25th that Mr. Walker had endeavored, through *ex parte* means, to have the rescheduled January 26th hearing go forward anyway, perhaps with a different judge, and Mr. Walker's assurance that confirmation was "uncontested".  The request was denied.  CH Tr.at 8-10.

[32] After the Confirmation Hearing, the Modified Plan was superseded by the Final Plan.

*and circumstances* of the City Homes case, they were convinced that this was not appropriate, not warranted for an --[33]

THE COURT:  Even if it doesn't fit the test?

MR. WALKER:  I'm sorry, Your Honor?

THE COURT:  Even if it doesn't fit the test from the Fourth Circuit?

MR. WALKER:  Well, it does, Your Honor.

\*       \*       \*

THE COURT:  I should approve it anyway?

MR. WALKER:  Now, we're going to establish a record that will show that it does meet the test.

THE COURT:  That will be a surprise to me, based upon what I've read.  But go ahead.

MR. WALKER:  Let me just, since Your Honor --

THE COURT:  And you mainly want this to apply to who?  Which class of creditors?

MR. WALKER:  The lead paint claimants.

THE COURT:  Who are going to be paid from insurance, or not?  Because you really have two different classes of lead paint claimants, I think.  The plan doesn't treat them that way, but that's really, probably, the way it breaks down as a practical matter.

MR. WALKER:  I respectfully disagree, Your Honor.  The class of lead paint claimants consists of anyone who has a lead paint claim, and everyone has the right to see [sic] recourse in the --

\*       \*       \*

THE COURT:  I mean, the lead paint claimants are getting paid by insurance, they're getting paid by insurance, right?

---

[33] The transcript must be in error as Mr. Walker was representing that the UST believed the Release to be appropriate and warranted.

MR. WALKER:  Right, Your Honor, if I --

THE COURT:  Maybe they're getting paid 100 percent, and maybe they aren't, and these are questions that come up into my mind, whether they are really getting paid 100 percent or not, but we can explore that.  As for the other creditors who I think, as best I can tell, the insurance expired around 1999, so that class of creditors, who may or may not know about his case, they're the ones that get the share in the $300,000, if it results from that, right?  If that's how much money we get, because that's uncertain, at best, and they would only get pro-rata.  And the plan disclosure statement don't say anything about the nature of those claims and how much they might be, and what the expectations are, so it's hard for me to see how they are being treated in a way that the *National Heritage* case would allow me to say that those claims should be released.  Seems pretty simple to me.  It's not complicated at all.

MR. WALKER:  Your Honor, I would agree, except I completely disagree with the conclusion, and there's some incorrect presumptions that were just stated.  Let me roll back to what the plan actually says.  The plan must be measured by the state law rights of the claimants, and the state law rights of the claimants are the same, regardless of whether there is available insurance or not.

THE COURT:  So why are you treating them differently?  Why does the plan treat them differently?

MR. WALKER:  Your Honor, I respectfully disagree with that.  The plan does not treat them differently.  If I may answer the question --

*        *        *

THE COURT:  You have people who are going to get paid by insurance, and as best I can tell, the insurance terminated, doesn't cover it after 1999.  If I'm wrong about the date, somebody could [sic] educate me.  And then from 1999 forward, those claimants, who everybody seems to agree probably aren't covered by insurance, they're going to have to share in the uninsured lead paint fund.  I think that's why it's called that.

MR. WALKER:  *No.*  Your Honor, if I can just explain, the actual provision in the plan is not correct to say that there's two different classes.  You first must start with --

29

THE COURT:  I know you didn't designate them as two different classes.  But whether that's correct or not, I'm not sure.  But the point is, there's another group of potential claimants, who may or may not have notice of this case, who the debtor didn't want to give direct notice to, or use its best efforts to give direct notice to, and that's the $300,000 fund group.

MR. WALKER:  Your Honor, I don't want to leave anything unanswered.  I have to first start with the correcting what the plan says, because the plan has all holders of lead paint claims in Class 5.  *Any lead paint claimant, under the plan, is allowed to go into state court and pursue litigation.*  So the rights prior to bankruptcy for all lead paint claimants are the same.  If there happens to be insurance coverage for a lead paint claim, that insurance coverage will be available for that particular claimant.  If, absent bankruptcy, there would be no coverage for that claim, then that would be the same case for the lead paint claim for which there's not coverage.  ***There was no distinction whatsoever in the legal treatment of the claimants in Class 5***.  It's really important.  And if that's not recognized, it's possible it could lead to an incorrect conclusion.  So there's a equal treatment --

THE COURT:  Then why do you have an uninsured fund that says they're going to get paid $300,000 pro-rata?  Who are those people?

MR. WALKER:  Okay, Your Honor, any --

THE COURT:  They're the uninsured lead paint claimants.  More importantly, how did the owners of the company get paid $360,000 in severance pay?  Where is that money going to come from?  Because the [sic] disclosure statement nor the plan explain that.

MR. WALKER:  Taking the first question first, the holder of a lead paint claim who wishes, who chooses by his or her own discretion to participate in the lead paint claim fund, is allowed to opt into the fund and to share in that fund in lieu of pursuing state court litigation.  ***Any lead paint claimant has that option, so everyone is treated, in Class 5, the same way***.

Now, on the second question, where's the money come from?  As our record will show, all of the real property owned by the Debtors and the non-Debtors will be liquidated, and the net proceeds will be used to fund the plan, and $300,000 of that will be set aside for the lead paint claim fund.  And if the sale proceeds are sufficient to

fulfill all obligations under the plan, then consistent with the
severance plan, which is contingent on the monies
being available after satisfying all obligation --

THE COURT:  That's not what the plan says.

MR. WALKER:  That's what the severance plan says.

THE COURT:  Where's the severance plan?  Is that going to come
into evidence?

MR. WALKER:  Yes, Your Honor.

THE COURT:  All right, good.

*        *        *

THE COURT:  All right, let me ask [Mr. Goldberg] a quick
question. …I don't want to put you on the spot, but have you read
the plan?[34]

MR. GOLDBERG:  Yes, Your Honor.

THE COURT:  All right, so have I lost my mind?

MR. GOLDBERG:  Your Honor, I didn't understand the source of
the court's concern regarding the distinction between insured and
uninsured claimants.  It was my understanding that all lead paint
claimants were basically in the same boat, depending on the facts
of their particular circle.

THE COURT:  Whether they're covered by insurance or not.

MR. GOLDBERG:  Right, but I didn't think that that was --

THE COURT:  And the insurance expired when, '99?  There's no
more insurance coverage after '99.  Am I right or wrong?

MR. GOLDBERG:  I don't recall.

THE COURT:  Well, '99 was a long time ago.

MR. GOLDBERG:  Certainly.

---

[34] Mr. Goldberg is Edmund Goldberg, Esquire, Counsel for the UST.

> THE COURT:  All right, so why do they call it an uninsured lead
> paint claimant fund?  It's $300,000 that said people who opt for
> that are going to get pro-rata share…. The disclosure statement
> doesn't tell me what that would mean in terms of meaningful
> compensation to people who are injured by lead paint.  There's no
> information whatsoever on that, so whether that's fair, equitable, et
> cetera, who knows?  But they can opt into that if they want, but
> I'm really confused as to why that's called the uninsured lead paint
> claimant fund, or words to that effect, if it doesn't mean uninsured
> lead paint claimants, which I take to mean people for that stretch of
> time when there was no insurance.  And they're going to get paid
> pro-rata from the $300,000, so it seems to me that those are the
> people that are affected by the [Release].
>
> MR. GOLDBERG:  Yes.
>
> THE COURT:  So, if they're not getting all or substantially all of
> their claim, why am I even considering a release under the Fourth
> Circuit's opinion, and Judge Catliota's opinion, too?
>
> MR. GOLDBERG:  I don't have an answer for you, Your Honor.

Confirmation Hearing Transcript at 11-20 (emphasis added) (CH Tr. ___).

With that, Debtor's Counsel began calling witnesses.

### 2.    Alex Cooper − The Projected Sale Value of the Real Estate to be Liquidated under the Modified Plan.

Mr. Cooper was the Debtors' first witness and he testified without objection as to the

combined value of the real estate and the likely net sales proceeds.  *See* Exh. 9.  Mr. Cooper also

gave his opinion as to what he believed would be the optimum real estate sales methodology:

> A (MR. COOPER):  My strategy would be to have live auctions of
> all five multi-family properties, live auctions of the one- to four-
> family properties that have greater value.  As far as the other
> properties, principally the single-family properties that don't have
> significant value, I would either sell them individually, or put them
> in packages, depending on their location.
>
> *              *              *

CH Tr. at 25.

In Mr. Cooper's opinion, and if his proposed methodology were used, total net sales proceeds would equal $8,245,300.  *See* Exh. 9.[35]

### 3.    Mr. Mankowitz − The Debtors' History, the Plan, the Post-Confirmation Period and the Release.

Mr. Mankowitz testified next.  He explained that he had been a part of the Debtors' low income rental housing enterprise since it began and had been CHI's President since 1986.  He also noted that CHI was capitalized with a $100,000 grant from the Enterprise Foundation and was qualified as a 26 U.S.C. §501 (c)(3) charitable entity.  He pointed out that CHI has a duty to indemnify certain persons (directors, officers, employees) per Section 6.01 of CHI's Bylaws.  CH Ex. 4.  Finally, he noted that many of the real estate parcels in question were donated to the Debtors as charitable gifts.  *See* Exh. 7.

Mr. Walker then asked Mr. Mankowitz about the Modified Plan's treatment of Uninsured Claimants:

> Q:  Turning to a different subject, in the opening remarks from His Honor, the court expressed interest in hearing something about what has been referred to as uninsured lead paint claims.  What can you tell us on the current information that you have about what uninsured lead paint claims are out there, to the extent you know?
>
> A:  Your Honor, we have approximately 10 cases we were served with that were uninsured.  Approximately four or five were dismissed, either four or five still pending, and one was settled for a nominal fee at that time.  It was only a total of 10 that we received uninsured [sic].

CH Tr. at 42.  Mr. Mankowitz then testified that he would not be willing to serve as plan administrative agent unless the Release is approved, stating, "I couldn't do that; because I

---

[35] In Mr. Cooper's view, the presence of lead paint in most of the structures would not dissuade potential purchasers or negatively impact at all upon the projected amount of net sales proceeds.  CH Tr. at 30.  Per Mr. Cooper's definition, net sales proceeds equal the sums received prior to the satisfaction of liens.

couldn't deal with the attorneys that I deal with now, knowing that they were screwing me personally." *Id.* at 44. Finally, his direct testimony concluded with the assertions that, (1) the Debtor's coverage for Insured Claimants would exceed hundreds of millions of dollars, (2) tenants should have ample knowledge of CHI's potential lead-paint liability due to the promotional and solicitation efforts of the lead-paint Plaintiff's bar and (3) that, in his opinion a failure to confirm the Modified Plan, followed by conversion to Chapter 7, would be a disaster. At that point, the Court took up the examination.

> THE COURT:  ...City Homes, Inc., whose bylaws were introduced as Exhibit 3, that's the only 501(c)(3) charitable entity, right?
>
> MR. MANKOWITZ:  Yes, sir.
>
> Q:  Okay, and you understand that the proposed release is supposed to apply to a group defined as the protected parties under the plan.  You're familiar with that?
>
> A:  Yes, sir.
>
> Q:  Okay, so who are those protected parties?
>
> A:  I think the protected parties would be myself and the board of directors.
>
> Q:  Right, who are they?
>
> *     *     *
>
> A:  Peter Werwath is the chairman of the board.  There's Edward Halliday, Lawrence Cager, and John Brandenburg.
>
> Q:  Would the term, in your mind, protected parties apply to any other individual, other than yourself and the individuals you just identified?
>
> *     *     *
>
> A:  I think it would apply to the employees of the corporation.

Q:  Who are they?

\*      \*      \*

A:  …It'd be Leslie Camrasel, it'd be Adam House, Robert Adam House, it'd be Sharon Pierson and Donna Jackson, George Hazerzak, Todd Sydowski, and Bruce McKenzie.  They would be the employees.  Outside staff and inside staff.

\*      \*      \*

Q:  Okay.  Who among the people you identified would be entitled to severance pay?

A:  All the above.  And I did forget one individual -- that's Ernest Matthews.  But everybody would be entitled to severance.

\*      \*      \*

Q:  …So, would the directors be entitled to severance pay?

\*      \*      \*

A:  No.

\*      \*      \*

Q:  Under the plan, if the plan is confirmed, what would be the money to fund the severance pay payments?

A:  It would come from the sale of the properties.

Q:  From the sale of the real estate?

A:  Yes, Your Honor.

Q:  The same source that's supposed to fund the $300,000 uninsured fund?

A:  Yes, Your Honor.

Q:  Okay.  I've gotten an understanding of the period of time that's covered by insurance from my reading of the plan and the disclosure statement, but I want to make sure that it's the correct one.  So, at what point in time did insurance coverage expire?

35

A: 1999 you couldn't buy a coverage house for that year.

Q: So, roughly speaking, how many tenants did the City Homes entities have?  I'm trying to get an idea of what the block of people might be who may not be covered by insurance.  That's what I'm trying to zero in on.

A: Well, there's approximately 100 properties that are lead-free, so you don't get suits there.

Q: Right.

A: So you'd have approximately 300 properties that would be open to sue so they have lead-based paint.  Then you have through the years, you know, it goes on and on, because through the years you have vacancies, you have about 60 people move a year.  So you have to do the math on it.  It's approximately 300 houses that would have a problem with lead-based paint for a year.

Q: So, is it possible for you to give me a rough idea of the number of tenants that may not be able to look to insurance if they had claims?

A: It would be hard for me to guess.  I mean, I would have to really sit down and do the math.  There's approximately 300 properties and if you turned over 60 -- but when you turn over 60, some are in lead-free properties.  I'm not trying to double-talk you but I really don't have the answer.

Q: No, I understand.  So, part of the answer is you don't know, right?

A: Part of the answer -- I'd have to sit down and look at all the records to give you the correct answer.  I really don't know today.

Q: Okay, all right.  Well, let me ask you for your understanding, since you're proposed to be the plan administrator and in light of your position with the Debtor, the $300,000 fund that I think is designated "uninsured lead paint claimant fund", that fund is primarily set up to deal with individual claims that are likely not covered by insurance, correct?

A: *Yes, Your Honor*.

36

\*       \*       \*

Q:  Have any judgments been entered in the State Court against any of the Debtors for lead paint liability?  Has anyone won before you filed bankruptcy?

A:  We have paid claims out before bankruptcy, yes, Your Honor.

Q:  All right.  I'll tell you what I'm trying to get a handle on.  What is compensated in those lawsuits?  What are the elements of compensation?  Give me a rough idea what the size of the claims are.

A:  Well, the claims range very, very different from soup to nuts. We've had claims settled for $10,000, 20,000, 30; there's also been claims that go way up and they have a couple children, the claims can be around a million dollars or more.  It just depends on the claim.  It depends on the...  It usually goes by the level of the elevated blood.  So, do you know what I mean?  It can go 100,000, 200,000.  They range very, very differently.  And years ago they were a lot lower, then as the years go on, the courts seem to award bigger judgments and they...

Q:  Okay.  Now, I'm asking you this – I know you're not a lawyer, right?

A:  Yes.

\*       \*       \*

Q:  And you're not an expert in damages and reducing [sic] lead paint claim awards, but you do have experience with dealing with them, right?  So, you're saying -- is it your testimony -- is it accurate to say that the amount of the damages are going to correspond to the amount of lead in the bloodstream?  Is that sort of the simplest...?

A:  That's my feeling.

Q:  …equation?

A:  Yes.

Q:  All right.  Is there anything else you want to add to that to help me -- to educate me...?

37

A:  Well, I can help you another way -- it seems when the families or the landlords that are being sued don't have insurance, the claim goes all the way down.  The amount they ask for goes all the way down because they know they can't collect.  When you have insurance is when these awards get high.

Q:  All right.  But would it be fair to say that that's based upon the judgment of the lawyer as opposed to the claimant?

A:  The judgement of the lawyer, yes.

                    *        *        *

Q:  …Are you aware as to whether -- and you can look through the exhibits if it'll help you.  Is the severance plan one of these exhibits?...

MR. WALKER:  Yes, Your Honor.  The actual plan itself is Exhibit 13.  It starts off with minutes from the board of directors.

THE COURT:  Okay.  So, we talked about a round number before but it's your understanding -- it's safe to say that all of the employees that you identified are going to be getting paid some form or severance pay, if the plan is approved?

MR. MANKOWITZ:  Yes, Your Honor.

Q:  Okay.  None of these people are contributing any money to the plan or any other property for that matter, right?

A:  Well, they're just employees of the corporation.  For City Homes Management, LLC.

Q:  Because that's who the agreement is with, correct?  And City Homes Management isn't contributing anything to the plan, right?

A:  That's correct.

Q:  Money or property.

A:  Right.

Q:  Right.  And you're not contributing anything to the plan, correct?

A:  No, I'm not, Your Honor.

Q:  Money or property.  You would be the plan administrator and you would have obligations after that if the plan was confirmed, but no money or property, right?  Correct?

A:  Right.

Q:  Okay.  All right.  Your understanding of the release that's being requested -- which class of creditors is it intended to apply to most specifically?  I mean, it's a general release so it could apply to everybody in the world, theoretically...[36]

A:  We're concerned about the lead paint claims.

Q:  All right, explain to me why.  Why you –

A:  Because after 1999, we had no insurance -- they come after you personally.  That's the fear.  If we have insurance through those years, they have no reason to sue the individual directors or employees of the corporation.  Because they have all that insurance -- hundreds of millions of dollars of insurance.  But it's after '99 where everybody's sitting out there on the fence with no insurance. They come after you personally, that's the problem.

\*        \*        \*

CH Tr. at 49-61 (emphasis added).

### 4.    Peter Werwath – Debtors' History, Board of Directors, Severance Plan, and Willingness to Liquidate at the Case's Inception.

Peter Werwath, CHI's Board Chairman, was the next witness called.  Mr. Werwath explained that he had been a Board Member from 1986 to 1991 and then again since 2000.  The bulk of his testimony was devoted to the philosophy behind the founding of CHI and the corporation's history.  As regards the Modified Plan, Mr. Werwath was first asked about the Release:

---

[36] This statement by the Court was incorrect.  The Release does not have a universal scope but, as Mr. Mankowitz readily admitted, is specifically targeted to bar the claims of post-1999, Uninsured Claimants.

Q (MR. WALKER):  …The question came up before.  What if that release provision is not approved by the Court? How would that affect your willingness to continue to serve under the plan?

A:  I would not be willing.  It just seems vital not only to myself but the other directors who played a very valuable role in trying to put together a way to get through this process of trying to be fair to everyone and fair to the employees, the tenants, and so forth. We're dedicated to them.

Q:  In all these years, has any lead paint claimant ever sued a member of the board of directors?

A:  No.

Q:  Well, if that's true, then why do you feel it's appropriate and justified that the plan would provide that you be released of claims that have never been brought against the directors?

A:  Well, first of all, the whole nature of lead paint litigation -- we just watched it change and change over the years.  It's very hard to predict where it will go.  We all -- the directors think it's possible we could be sued personally.

We don't think they would prevail but there could be...  We've heard second hand that there may be hundreds of more cases coming forward.  So, there's a lot of potential cases.  We don't know for a fact that we would be sued personally, but we feel it's a distinct possibility.  And we really feel that the release is fair and necessary.

We're a 501(c)(3) nonprofit and it's my understand we have charitable immunity, both the board members and the corporation. And we volunteered -- we weren't asked to -- we volunteered to basically put up all our assets.  By the time this is worked out, they'll all be gone.  Millions of dollars in assets, which we see as a sacrifice -- not personally.  Maybe our time is a sacrifice.  But we're putting up all these assets and we think it's only fair that we get releases and are able to have peace of mind that we can go ahead with this without big clouds over our heads.[37]

---

[37] To be clear, none of the Protected Parties have agreed to stake any of their own money or property under the Modified Plan.  The "millions of dollars in assets" to which Mr. Werwath refers are the collective real estate assets of the Debtors and Affiliates, assets that are in any event subject to creditor claims in bankruptcy either directly or through CHI's ownership interest in the Affiliates.

CH Tr. at 74-76.

He was then asked about the severance plan.

> Q:  And why was [severance plan] adopted?
>
> A:  Well, we had a case -- I'd say it was about 2008 – I don't think we had ever -- to the best of my knowledge, we never let anyone go except for cause.  …We had to downsize and we were able to keep almost everyone on or find them other jobs.  One person had to be let go without cause.  So, we offered severance.  We did not have a written policy.  And it was at that time we realized we needed one, and we eventually came up with one.

CH Tr. at 76-77.

The Court then took over the examination of Mr. Werwath.

> THE COURT:  …So, when did City Homes, Inc. and the other entities first begin to consider filing bankruptcy?
>
> MR. WERWATH:  Well, June of 2013.
>
> Q:  June of 2013, okay.  And what was done, if anything?
>
> A:  Well, we didn't decide to do it.  We decided to look into it.  We hired an attorney, Jim Vidmar, who represented us up until a year ago.  And we looked into the feasibility and considered it – I guess others considered it a fairly complex case, *because we were from the beginning willing to liquidate, willing to have a compensation fund.  These are our ideas.*  And we would not want to take anything away from it.  We just wanted an orderly…
>
> MR. WALKER:  Mr. Werwath, let me –
>
> THE COURT:  Stop.  Stop.  He's testifying.  Stop.  Don't do it. Go ahead, finish your thought.
>
> MR. WALKER:  I have to say one thing for the record, Your Honor…
>
> THE COURT:  Mr. Walker.  You're going to ask him a question when he's finished testifying.

41

MR. WALKER:  It's not a question.  I just have to… He's no [sic] understanding his testimony inadvertently breached the attorney-client privilege.  And all I'm going to do is advise the witness to obviously answer –

THE COURT:  … You object.  That's what you do.  And then you state the grounds.  You don't start advising him while he's in the middle of testifying.  It's just not done.  Go ahead, sir, finish your testimony.

MR. WERWATH:  Your Honor, sorry about that.

THE COURT:  It's not your fault.

MR. WERWATH:  So, it was in about July of 2013 that we worked out some rough scenarios, which had to do with – we had what we called debtor properties and our, what we call non-debtor properties,  which we were planning to hold onto.  There were scenarios where we were going to keep operating those because they were ones with the least, if not zero lead paint problems.  And by, I guess, July, we retained Jim Vidmar and I guess our filing was around September 10th of that year, if I'm not mistaken.  And so that's really how it started.  It started with scenarios.

CH Tr. at 79-80 (emphasis added).

**5.      Stewart Hershey – Financial Projections Under the Modified Plan.**

Stewart Hershey of Urban Ventures was the Debtors' final witness.  Mr. Hershey works for the Debtors on a contract basis, preparing financial forecasts and projections.  He testified that the financial projections included in Exhibit 11 are accurate and that in his opinion the Debtors would likely meet them under the Modified Plan.  He also testified that Mr. Mankowitz's severance payments, the highest overall, could reach $95,000.  He is neither a lawyer nor a liquidation expert, yet he testified there would be a "massive disruption" if this case was converted to Chapter 7.  With that, the Debtors' case came to a close and the Committee presented its case.

42

6.    **The Committee's Case.**

The Committee's presentation began with another colloquy between the Court and

Counsel regarding the Release.

> MR. MACLAY:  Right, and obviously, Your Honor, the committee understands and has always understood that it represents the interests of both claimants who may have a claim debtor insured, [sic] as well as those who have claims that may be uninsured.
>
> And, in some cases, at this point, Your Honor, it's hard to know which is which potentially.  ***But we at least know that there are some in each category and we represent all of them.***  And we have kept that in mind throughout the course of our negotiations and deliberations over the course of this.
>
> THE COURT:  All right.  Well, talk to me about that then, because that's important.
>
> MR. MACLAY:  Okay.
>
> THE COURT:  It was my understanding that the committee represented essentially parties who had already filed lawsuits.
>
> MR. MACLAY:  Your Honor, to break that down a little bit. Technically, what the committee is, it's individual claimants themselves who themselves have lead paint claims against one or more of the Debtors, and they are represented in the affairs of the committee by their tort counsel.
>
> So as – you know, putting on their committee hats, the tort counsel, who are on the committee because they represent a tort victim, represent the interests of the overall constituency, which includes the unsecured claims who have nothing to do with lead paint.  It includes the people with lead paint claims, and that includes both those whose claims may have insurance available, as well as those who may not have insurance available.
>
> THE COURT:  Okay.  But the members of the committee are all involved in lead paint litigation, right?...

*      *      *

43

MR. MACLAY:  ***The tort counsel who represent their clients on the committee are all lead paint plaintiff's lawyers who represent lead paint claimants against City Homes and its affiliates.***

THE COURT:  Okay.  Now, but listen to Mr. Manjowitz's [sic] testimony.  It seems to me he's saying that these lawsuits are filed by people who believe that they have insurance coverage to look to.  Which, if they have an attorney, that makes sense to me because that's how the attorneys' fees are presumably going to be paid?

MR. MACLAY:  Sure.  And, presumably, Your Honor, following your logic, if there were claims as to which there was no insurance, but had significant value, presumably, some attorney would connect with that claimant and pursue such a claim; and, in fact, I'm about to elicit some testimony from Mr. Albright that addresses that point.

THE COURT:  Okay.  Well, I'll take whatever Mr. Albright's going to testify to, and I want to hear that.  But I think you're going to have to figure out a way to present to me something that identifies claimants who are covered by insurance and those who aren't, or who might not be.

                          *      *      *

MR. MACLAY:  But I'm not sure that that is an achievable goal, because that would require us to be making state law coverage determinations in an insurance-neutral plan.  I don't think we can do that.

THE COURT:  Okay.  Well, I mean, that's the question that -- that's one of the questions the Fourth Circuit wants me to answer, the way I read it.  I mean, maybe there's a way to deal with it, I'm not sure.

MR. MACLAY:  I think there is, Your Honor.  And, honestly, if --

THE COURT:  And I'm going to tell you why, again, just for the record here.

MR. MACLAY:  Oh, sure.

THE COURT:  Those who are covered by insurance and they're going to get X.  They get a certain kind of treatment under the

plan.  Those who aren't, get another kind of treatment.  And these are not separated by classification.

And I think fundamental Chapter 11 law would probably say that they should be, but they haven't been under the plan.  All right?  Although they're getting different treatment, so that's a conundrum.

MR. MACLAY:  Right.

THE COURT:  In order to answer several of the questions, including the question of the release, I have to be able to focus on that class that clearly is anticipated isn't going to be paid in full, that they're only getting pro rata payment.  That's what the plan says.

MR. MACLAY:  Right.  And, obviously, Your Honor, in this case, we didn't have any objections to classification that we needed to address.  Had we gotten such an objection, however, we would have established that this classification is correct, among other things.

THE COURT:  Well, but this goes to that question of the release.

MR. MACLAY:  I understand.

\*        \*        \*

MR. MACLAY:  Right.  And I don't want to dwell on this too long, Your Honor, because as to limited time.  I will say that we are fully prepared to go through the relevant factors for releases and explain why we think they're met, including as to the potentially uninsured lead paint claimants, *although it is impossible to know, I believe, exactly who they are*.  There may be some people it would be easier to identify, and there are others that would be in a more murky category.

CH Tr. at 100-105 (emphasis added).

Committee member, David Albright, Esquire, was the Committee's only witness.  He testified to his twenty years of experience as a lead paint litigator in Baltimore and that for the last 15 years he has prosecuted lead paint litigation against the Debtors.  As of the date of the Confirmation Hearing, he estimated he was actively representing at least 30 lead paint clients

against the Debtors.  He noted that trade (unsecured) creditors are to be paid in full under the

Modified Plan while some lead paint claims (the Insurance Covered Claimants) will be paid

through insurance and others (the Uninsured Claimants) will not.  He flatly stated that he had not

and would not pursue claims against the Debtors that he knew to be uninsured and that the

uninsured fund was a "good outcome" for uninsured claimants because, "as I indicated

previously, in my experience, an uninsured lead paint claim against City Homes would be

virtually worthless.  There's just a huge, huge cost involved with these claims to begin with, and

this would be a huge (indiscernible) for any lawyer to take on such a claim."  CH Tr. at 113-14.

> Mr. Maclay then asked Mr. Albright about the Release.

> Q:  Mr. Albright, are you familiar with the release and injunction
> provisions in the plan?

> A:  Yes.

> Q:  And the released parties include the board of directors of City
> Homes, correct?

> A:  Right.

> Q:  Does the committee support the releases?

> A:  Yes.

> Q:  And why is that?

> A:  Your honor, first of all, the releases were a negotiated item,
> negotiated, of course, with things such as the amount of the
> uninsured claim fund, with the funding of the document repository,
> with the length of time for the document repository.  But also, the
> way the Maryland law is now, pursuit of a claim with the directors
> would be, to be blunt about it, extraordinarily challenging…

> Q:  In your view, Mr. Albright, is the value of any potential
> lawsuits against the board of directors or the officers and
> employees in their personal capacity of City Homes, would those
> claims have much value?

A:  No.

Q:  Are you aware of any lawsuits against the board of directors' members prior to the bankruptcy?

A:  No.

Q:  If such claims had had value, would you expect law firms to have brought them?

A:  Yes.

Q:  Mr. Albright, you are aware that the plan allows for severance payments to City Homes employees, correct?

A:  Right.

Q:  Does the committee support allowance of severance payments?

A:  Right.  There are several portions of the severance payments that we thought was very attractive; one was that, first of all, it's conditional upon there being money, and second of all, we thought it was a good idea that there be some carrot to keep the City Homes employees there while City Homes is undergoing the bankruptcy.

Q:  And why was that important?

A:  Employee retention.

Q:  I have no further questions, Your Honor.

*Id.* at 114-15.

The Court then examined Mr. Albright:

THE COURT:  …If any claims against the directors would be worthless, what's the point of having releases?

MR. ALBRIGHT:  Well, our view, ***Your Honor, was that the releases of the board of directors was really a throw away.***  It was something that they thought was important for them.  You know, under Maryland law, these are just not good claims.

47

I heard Mr. Werwach [sic] say today that he was concerned that there might be future claims, which is possible if the law changes because the law does change from time to time in the lead paint field.  But, right now, it would be a hopeless claim, in my opinion.

Q:  What about Mr. Manjowitz [sic]?

A:  Mr. Manjowitz [sic], it is a potential claim; however, from our review of Mr. Manjowitz [sic] on Lexus-Nexus [sic], he is married, which would make collectability of, I guess, any of his assets very challenging.

Q:  So?  What I'm asking you --

A:  Right, right.

Q:  -- if a different measure of liability.  I mean, what I'm understanding is you're saying well, the board of directors are more removed.

A:  Correct.

Q:  Than somebody who has a management position.

A:  Right, right, right.

Q:  So is that the case?  I mean, educate me on it.

A:  Sure, sure.

Q:  Is it more of a likelihood that someone could have a successful claim against Mr. Manjowitz?

A:  Yes, because of his management responsibility.  It's just when you get to the collection phase of it, that's where the hurdle comes.  And, again, where you tie back to what I said earlier about the cost of prosecuting these claims, if all you want to do -- if you're in the (indiscernible) was to sue Mr. Manjowitz and you, as a plaintiff's lawyer, had to put down $50,000 plus out-of-pocket expense, even though he's married, which means, you know, his wife is, of course, there, so how would you collect?  That's a very, very challenging scenario from a plaintiff's lawyer perspective.

Q:  Okay.  Now, if you can't answer this question, you don't feel comfortable answering it in light of the back and forth between

myself and your counsel before you took the stand, fair enough.
I'll just red flag it like that for you.  But can you give me an idea of
what you think the expectation of the total value of any uninsured
claims might be?

A:  Okay.  So first of all, you have to look at whether there would
be collectability.  So my view, having done this for, you know, 20
something years, I mean, one in the situation where you have, you
know, uninsured entities is that, in terms of collectability, the value
of those claims is virtually zero.  Now, if your question is if they
went to Court, if you get a big verdict, possibly.

But, again, you have that whole situation where you have the
plaintiff's attorney wants to get paid, how's he going to get paid, is
he going to put out all this money with out-of-pocket expenses?  I
mean, it's sort of, like, why would they do it?

Q:  Well, the $300,000 provision in the plan is a pro rata provision.

A:  Right.

Q:  So in my mind, that translates as a practical matter, and it's
expected that claims -- or at least there's some idea, some thought,
something closer to reality than speculation that they could exceed
$300,000.

A:  Well, that was basically, Your Honor, a function of our
direction to, as counsel, to squeeze as much out of City Homes as
we could get.  So that was really like his negotiation.  And if you're
into numbers, today, I can understand why the $300,000 figure is a
good figure.

*       *       *

Q:  Okay.  Why is that?

A:  Because, I mean, I've heard that perhaps they'll have several
hundred thousand dollars to pay severance payments.  And I'm
thinking to myself, well, is that really going to happen?
Obviously, we would love to have more than $300,000, but, you
know, that was what we negotiated.  And also it is a negotiated
term, so we have to keep other things that were really very
important to us, like the documents repository.  I can't
overemphasize how important that is for us, Your Honor.

Q:  Why is that so important?

A:  Because one of the biggest problems in the lead paint world is providing the time period of residency.  Sometimes you have documents besides tenant records which show you that.  But really, the gold standard is the tenant records of the defendant.  Our client, Your Honor, they don't keep the leases.  I don't think in 22 years, I've ever had a client come in and say, oh, by the way, here's my lease from 20 years ago.  Don't have it.  Most landlords who are in the position of City Homes do keep pretty good records, and then that can tell you right away if you've got a good case or a bad case.

Q:  Well, what issue do you see if the plan isn't confirmed with respect to the maintenance of records?

A:  That's a huge problem, huge problem.

Q:  Why?

A:  Because if the plan is not confirmed, it'd go into Chapter 7, everything's liquidated *and then the documents go to the four winds.*

\*        \*        \*

THE COURT:  Okay, all right.  Let me ask you something else then --

MR. ALBRIGHT:  Sure.

Q:  -- that I've been wondering about.  There was a footnote in one of the papers filed on behalf of the Debtor that indicated that the committee doesn't agree with the charitable immunity premise, that the Debtor is suggesting somehow justifies the ability to get releases.  In other words, this money wouldn't have to be paid to creditors if they were not in bankruptcy, I guess.

And maybe they're saying it wouldn't have to happen in bankruptcy either because Maryland state law protects it.  And there was a footnote that said the committee doesn't agree with this position.

A:  Correct.

Q:  Why?

A:  Because under Maryland law, the determination of charitable immunity is really a combination of law and facts.  And just because you have a 501(c)(3), doesn't mean that you also get benefit of the charitable immunity doctrine.

So where I have seen this in State Court, Your Honor, where that issue is almost always addressed, you have discovery on the issue.  You've got hearings on the issue.  It's a much more complicated question than what the respect with the Debtor (indiscernible) what he suggests.

Q:  Okay, all right.  So it's not just a simple 501(c)(3), so that means --

*        *        *

MR. ALBRIGHT:  It's not the end of the inquiry.

*Id.* at 115-21 (emphasis added).

With that, the presentation of evidence ended.  A briefing schedule was set and oral argument was fixed for April 29, 2016.  The Plan Proponents papers were timely filed (Dkt. Nos. 727 and 728) and the April 29th hearing was a lively affair.[38]  Nevertheless, there would be more redundancy than added value to be gained from re-printing excerpts from the exchanges between the Court and the Plan Proponents.  However, because the UST has not been heard from in depth in this Opinion, and filed no papers either "yea" or "nay", the Court concludes it is appropriate to quote a portion of Assistant UST, Gerard Vetter, Esquire's, oral statement in support of the Final Plan:

MR. VETTER:  Your Honor, I'm feeling kind of in an odd position of -- by indicating that the U.S. Trustee supports confirmation of the plan, blessing releases in any case.  And also, I'm in a somewhat unique position because in the *Neogenix* case, at that time, I was managing the U.S. Trustee's Greenbelt office where the case was pending and trial attorney Lynn Kohen and I fought tooth

---

[38] The Final Plan was filed after the Confirmation Hearing and before oral argument (Dkt. No. 733).  The Debtors also filed a post argument memorandum (Dkt. No. 749).

and nail against the releases in that case. Judge Catliota essentially
ruled against us and upheld it. Here, in the case again, we met
with Mr. Walker multiple times to talk about the releases. We –
everything that we asked to be done to put in the disclosure
statement to make sure that it was adequately spelled out for
everybody what the factors were and how they met here and that
they would make the evidentiary record at the confirmation
hearing that they were met, they did that. They changed the
language of the ballots so that those who were voting would know
that there was a release that they were essentially approving by
voting for the plan. And the plan here is so much -- if it meets the
*Behrmann* factors and the plan in *Neogenix* did not, that truly was
a liquid –

THE COURT:  What about the pro rata class?

MR. VETTER:  The pro rata class? The folks who were paid in
*Neogenix* -- what makes it different here is that there were no
unsecured creditors in *Neogenix*.

*        *        *

MR. VETTER:  People who were being paid were shareholders.

THE COURT: So what about the specific class that they're worried
about filing suit down the road?

MR. VETTER:  In this case?

THE COURT:  …The uninsured lead paint claim.

*        *        *

THE COURT:  That's why the release in the plan.

MR. VETTER:  Right. Your Honor, I will acknowledge that –

*        *        *

MR. VETTER: -- the big difference is that in *Neogenix* the
potential claimants were virtually all known. They were not quite
all known because many of them had their shares with
stockbrokers, and so the notice was given to the stockbrokers and it
wasn't clear that the individual shareholders actually knew about it.

52

THE COURT:  So what about the creditors in this case?

MR. VETTER:  In this case, Your Honor –

THE COURT:  The potential creditors?

MR. VETTER:  -- I think that the proviso in the confirmation order that has been referenced by counsel for the Debtor and the Committee, is an effective way to deal with that concern.[39]  And the thing that also is different here, very much different than in *Neogenix* is those directors had nothing to do with the company once the assets were sold to a third party. Here, they're going to continue to manage the Debtor to try to maximize the sale value of the property. We have the $300,000 bird in hand.  If this plan is not confirmed, and the case goes to a Chapter 11 trustee, or a Chapter 7 trustee, we're adding another layer of expense that will take away from that. And we don't know what will happen; we don't know whether that trustee will do better than the folks who have been managing these properties, know these properties inside and out. And, you know, that is why, you know, admittedly somewhat holding our nose, we believe that this is the unique case that the Fourth Circuit has talked about, much more unique than the *Neogenix* case. And that is why we are supportive of confirmation in this case, despite the concern that we have in every case where there is an attempt to put forward a release of non-debtor third parties.  Does Your Honor have any other questions or concerns for the U.S. Trustee?

THE COURT:  No.

Oral Argument Transcript 7-10.

Unlike the UST, the Court cannot find refuge in "holding its nose" but must instead apply the law to the facts.  To do otherwise would be to live in a fantasy world.  The fate of the uniformed, unrepresented, Uninsured Claimants that the Plan Proponents advocate through the device of the Release must be acknowledged and rejected through the emphatic denial of

---

[39] Mr. Vetter is referring to the Plan Proponents' eleventh hour, oral proposal to except Uninsured Claimants without notice of this case from the effect of the Final Plan.

confirmation.  The Court is ready to explain why.  But a word about the scourge of lead paint poisoning would first be appropriate.

### III.    Lead Paint Poisoning

With all the thousands of words and reams of paper expended on this case, precious little has been written about the core issue – lead paint poisoning – and its victims.  Historically, the use of lead in American products and industries has been pervasive.  Clifford L. Rechtschaffen, *The Lead Poisoning Challenge: An Approach for California and Other States*, 21 Harv. Envtl. L. Rev. 387, 390 (1977).  Lead was commonly used in gasoline and paint, *Id.*, and it wasn't until the 1996 Amendments to the Clean Water Act that Congress banned leaded gasoline. 42 U.S.C. § 7545 (2016).  Before that watershed event, Congress took multiple steps to curtail the use of lead paint in residential homes before banning its use in 1978.  Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. §§ 4821–4846 (2016); Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. §§ 4851–4856 (2016).  Nevertheless, private residential buildings constructed before 1978 may still contain lead based paint and the Debtors readily admit that such is the case with their leased dwellings.

Exposure to lead from lead based paint can occur through ingestion of paint chips or consumption of contaminated dust or dirt.  U.S. Dep't of Health and Hum. Servs. Public Health Service, *Toxicological Profile for Lead*, 4 (2007).  Dust and dirt become contaminated due to deterioration or abrasion of paint and merely breathing in those particles, or touching them and then one's mouth, can cause toxicity.  *Id.* at 4–5.  A lead based paint hazard is defined as, "any condition that causes exposure to lead from lead-contaminated dust, lead-contaminated soil, [or] lead-contaminated paint . . . that would result in adverse human health effects . . . ." 42 U.S.C. § 4851b (2016).  There is no amount of lead that is safe according to the Centers for Disease

Control and Prevention (CDC).  U.S. Dept. of Health and Human Svcs., Ctrs. for Disease

Control and Prevention, https://www.cdc.gov/nceh/lead/acclpp/blood_lead_levels.htm  (last

visited January 13, 2017).[40]

Children face a higher risk of lead poisoning than adults.  Advisory Committee on

Childhood Lead Poisoning Prevention, *Managing Elevated Blood Lead Levels Among Young

Children,* 97-113 (2002).  This is so in part because of their poor hygiene habits and frequent

hand to mouth contact.  Their vulnerability is magnified by their ongoing development (physical,

metabolic and nervous system) which results in greater rates of absorption.  *Id.*at 77-95.

The CDC recommends medical treatment when a blood lead level (BLL) above 5

micrograms per deciliter ("μg/dL") is present in an individual. U.S. Dept. of Health and Human

Svcs., Ctrs. for Disease Control and Prevention, *Lead*, https://www.cdc.gov/nceh/lead/ (last

visited January 13, 2017).  Children who have a BLL of 10 or more μg/dL require case

management.[41]  U.S. Dept. of Health and Human Svcs., Ctrs. For Disease Control and

Prevention, *What Do Parents Need to Know to Protect Their Children?*,

http://www.cdc.gov/nceh/lead/acclpp/blood_lead_levels.htm (last visited January 13, 2017).

The CDC does not advise any treatment for children or adults who have a BLL < 45 μg/dL.  *Id.*

---

[40] The most common method to diagnose lead poisoning is through a blood test. U.S. Dep't of Health and Hum.
Servs., *Toxicological Report for Lead*, 10 (2007).  The resulting blood lead level indicates the amount of exposure,
but not the length of exposure.  *Id.*  Lead also settles in bones, which is correlated to the blood lead level.  D'souza
Herman *et. al.*, *Evaluation, Diagnosis and Treatment of Lead Poisoning in a Patient with Occupational Lead
Exposure: A Case Presentation*, J. of Occupational Med. and Toxicology (2007).  The amount of lead in the bone
and blood will be distributed into an equilibrium.  *Id.*  X-rays can also be used to determine if an individual has lead
poisoning, but blood tests are the more common method.  *Id.*

[41] The CDC used to categorize children who had a BLL of ≥ 10 μg/dL as being at a "level of concern." Advisory
Committee on Childhood Lead Poisoning Prevention, Recommendations, (2012)
http://www.cdc.gov/nceh/lead/acclpp/blood_lead_levels.htm. Under ACCLPP's 2012 recommendations, the CDC
no longer uses the language of "level of concern" for a BLL of ≥ 10 μg/dL due to its stance that lead is harmful at
any level.  *Id.*

If a person has a BLL ≥ 45 μg/dL then a treatment called chelation therapy[42] can be used to reduce BLL. Margaret Sears, *Chelation: Harnessing and Enhancing Heavy Metal Detoxification*, Sci. World J. (2013).  However, lead poisoning leads to irreparable damage that cannot be treated.  *Id.*

Lead is toxic to the human body.  It affects multiple organ systems as it binds in tissues, "create[s] oxidative stress, affect[s] endocrine function[s], block[s] aquaporins, and interfere[s] with functions of essential cations such as magnesium and zinc."  *Id.*  In children, at least three major organ systems are at risk from lead poisoning: 1) the central nervous system, 2) the renal system and 3) the hematologic system. *Measuring Lead Exposure in Infants, Children, and Other Sensitive Populations*, National Research Council, 32–34 (1993).  Significant exposure may result in "anemia, kidney damage, colic, muscle weakness, brain damage," and death. U.S. Dep't of Health and Hum. Servs., Public Health Service, Toxicological Report for Lead, 10 (2007).  At lower levels, significant, but less severe, effects on blood, development and behavior may occur.  *Id.*  At even lower levels, a child's mental and physical growth may be stunted.  *Id.* Fetuses may be born prematurely with lower weight.  *Id.*  Evidence suggests that these effects can last into adulthood without a chance of recovery.  *Id.*

Adults may be at lower risk to lead poisoning than children, but they can still have dire consequences.  *Id.* at 8–9.  Lead poisoning targets adults, like children, at the nervous system.

---

[42] Chelation therapy involves a synthetic compound that is "administered as oral, intravenous, suppository or transdermal preparations."  Margaret Sears, *Chelation: Harnessing and Enhancing Heavy Metal Detoxification*, Sci. World J. (2013).  Once administered, the synthetic compound, or chelating agent, binds metals to itself and carries the metal to the kidneys for excretion through urine.  *Id.*  One widely cited chelation trial of children with a BLL < 45 μg/dL has not shown any long term benefit of children finding no" significant difference between the treatment and control groups."  *Id.*  Chelation therapy only removes metals from the blood or tissue, not from the bone.  D'souza Herman ET. AL., Evaluation, Diagnosis and Treatment of Lead Poisoning in a Patient with Occupational Lead Exposure: A Case Presentation, J. OF OCCUPATIONAL MED. AND TOXICOLOGY (2007).  When the therapy is discontinued metals are redistributed from the bones back into the tissue.  *Id.*  Thus, individuals with lengthy exposure to lead will require multiple sessions of therapy.  *Id.*

*Id.* at 8, 10.  Long term exposure can lead to decreased nervous system performance.  *Id.* at 8.

Weakness in fingers, wrists and ankles may also occur.  *Id.*  Lead poisoning also increases blood

pressure and this risk is heightened the older you are.  *Id.*  Anemia is also a possibility.  *Id.*  High

exposure can lead to severe brain and kidney damage that may result in death.  *Id.* at 8–9.

Finally, pregnant women face an increased miscarriage chance and men's sperm producing

organs may be damaged.  *Id.* at 9.

As to how these injuries are addressed in Maryland, *Ross v Housing Authority of*

*Baltimore City,* 430 Md. 648, 668 (2013) laid out the chain of causation that must be established

to support a valid lead paint poisoning claim:

> (1) [T]he link between the defendant's property and the plaintiff's
> exposure to lead; (2) the link between the specific exposure to lead
> and the elevated blood lead levels, and (3) the link between those
> blood levels and the injuries allegedly suffered by the plaintiff.  To
> be a substantial factor in causing Ms. Ross' alleged injuries, the
> Payson Street home must have been a source of Ms. Ross'
> exposure to lead, that exposure must have contributed to the
> elevated blood lead levels, and the associated increase in blood
> lead levels must have been substantial enough to contribute to her
> injuries.

Thus, this case pits the interests of the Uninsured Claimants, potentially poisoned by lead,

against those of the Protected Parties and their desire for freedom from liability through the

Release's escape hatch.

## IV.    Summary of the Final Plan

The Final Plan was filed after the conclusion of the evidentiary portion of the

Confirmation Hearing and before oral argument.  Here are the terms and provisions

(substantially unchanged from prior versions) most material to this Opinion.  Articles 5.1 and 5.2

provide that each reorganized Debtor shall continue with its separate existence while the

Affiliates will merge into CHI.  Article 5.4 mandates that all of the real estate owned by the

Debtors and the Affiliates will be liquidated over a projected period of nine months.  CH Exh.

12.  Article 4.5 classifies all "Lead-Paint Claimants" in one group that includes both Insurance

Covered Claimants and Uninsured Claimants and provides as follows:

> 4.5    Class 5A-L –Lead-Paint Claims.[43]  This Class consists of
> Lead-Paint Claimants.  Lead-Paint Claimants shall be entitled to
> initiate, continue and/or prosecute their Lead-Paint Claims in the
> non-Bankruptcy Court tort system against the Debtors and the
> Reorganized Debtors for the purpose of establishing the Debtor(s)'
> liability for such Lead Paint Claims. The rights of Lead-Paint
> Claimants to recover on or enforce such Claims shall be limited to
> the proceeds of Lead-Paint Insurance Policies applicable to their
> Lead-Paint Claim. Any Lead-Paint Claimants may elect to
> participate in the Uninsured Lead-Paint Claim Fund described
> below in lieu of pursuing their Lead-Paint Claim in the tort system.
>
> Upon the Effective Date, the Reorganized Debtors shall establish
> the Uninsured Lead-Paint Claim Fund for the payment of Lead-
> Paint Claims whose Holders elect to participate in receiving
> distributions from the Uninsured Lead-Paint Claim Fund, which
> election shall be in the sole discretion of each such individual
> Holder. The Uninsured Lead-Paint Claim Fund shall be funded
> after the Effective Date, from a portion of the Net Sale Proceeds of
> the Properties, with the sum of Three Hundred Thousand Dollars
> ($300,000). To the extent there are additional funds available,
> subject to the Debtors having paid Administrative Expense Claims
> in full and having sufficient funds to meet all of their other
> obligations under the Plan excluding only the payment of
> Severance Plan benefits, in lieu of Barry Mankowitz receiving the
> projected Ninety-Five Thousand Two Hundred Eighty-Nine
> Dollars and Twenty-Seven Cents ($95,289.27) to which he
> otherwise may have been entitled to receive under the Severance
> Plan, this sum will be contributed as additional funds to the
> Uninsured Lead-Paint Claim Fund prior to any Severance Plan
> benefits being paid. To participate in the Uninsured Lead-Paint
> Claim Fund, each Lead-Paint Claimant shall provide the
> Reorganized Debtors with an executed Uninsured Lead-Paint
> Claimant claim form within two (2) years after the Effective Date
> in the same or substantially similar format to that attached hereto

---

[43] The capital letters are included in the class designation to connect individual claimants to the residences owned by
a particular Debtor.

as **Exhibit C**, setting forth (a) residency or significant periods of time spent at a property owned by any Debtor, other than Johnston Square and Royalton, and the dates of residency or significant periods of time spent there; and (b) an elevated blood lead level of at least 5μg/dl at or about the time of the Claim Holder's residency at a property owned by a Debtor or the time spent there, with documentation evidencing such blood level and the date of the test. Upon such a showing, the Uninsured Lead-Paint Claim shall be allowed. As soon as reasonably practicable after the resolution and determination of all timely filed Uninsured Lead-Paint Claims following the expiration of the two-year period for filing such Claims, the Reorganized Debtors shall pay each such Holder of an Allowed Uninsured Lead-Paint Claim such Claimant's equal pro rata share of the Uninsured Lead-Paint Claim Fund, calculated by dividing the amount of the Uninsured Lead-Paint Claim Fund by the number of timely filed Allowed Uninsured Lead-Paint Claims. Holders of Lead-Paint Claims participating in the Uninsured Lead-Paint Claim Fund shall receive no further payment under this Plan, the Holder's Lead-Paint Claim shall be deemed to be released, settled and satisfied upon receipt of such payment, and such Holders shall be permanently enjoined from commencing or continuing the prosecution of the Holder's Lead-Paint Claims in any court. . . .

Classes 5A-L are impaired and Holders of Class 5A-L Claims are entitled to vote to accept or reject this Plan. Holders of Class 5A-L Claims who fill out and submit a form of Ballot certifying that the Holders have a Lead-Paint Claim against one or more of the Debtors shall have such Claim temporarily allowed, solely for purposes of voting on the Plan, in the amount of one dollar and will be entitled to vote that Claim in that amount. The temporary allowance of such Class 5A-L Claims shall be without prejudice to the Debtors' rights and defenses with respect to the dispute of all such Claims. [44]

As was made clear at the Confirmation Hearing, the expectation is that Insurance

Covered Claimants will simply return to the prosecution of their pending cases in the state court.

*See also* Articles 5.6 and 9.2. On the other hand, because Article 4.5 expressly limits state court

---

[44] Mr. Mankowitz's decision to dedicate his expected severance payments of $95,289.27 to the Uninsured Lead-Paint Claim Fund and the extension of the claim form filing deadline from one to two years are modifications added to the Final Plan.

litigation claims to, "the proceeds of Lead-Paint Insurance Policies applicable to [a claimants']

Lead-Paint Claim", Uninsured Claimants will be compelled to resort to the $300,000 uninsured

fund for a full and final *pro rata* satisfaction of their claims against either the Debtors or the

Protected Parties.  Uninsured Claimants therefore do not have a litigation option under the Final

Plan.  Instead, upon *pro rata* payment from the $300,000 fund, or the expiration of the two-year

claims filing deadline, the claims of Uninsured Claimants will be forever released and

discharged.  Mr. Mankowitz unequivocally acknowledged in his testimony that, notwithstanding

the seeming applicability of the Release to all Lead Paint Claimants, the Uninsured Claimants

are the parties targeted.

      Article 5.6(e) creates the document repository and is intended to include the following

documents:

> . . . all documents in the Debtors' possession, custody or control as
> of the Confirmation Date (including all documents from the Non-
> Debtor Affiliates) that relate to: (1) the presence or absence of lead
> paint in any properties ever owned, operated or managed by
> Debtors or Non-Debtor Affiliates; (2) maintenance and repair
> records, including, but not limited to, work tickets, records of lead
> paint interventions and/or abatements, and records related to
> property renovation and/or rehabilitation; (3) names, ages and any
> other information relating to tenants of the Debtors or Non-Debtor
> Affiliates, including, but not limited to, leases and rental
> applications, all rent records, rent cards, and other information
> showing the dates of tenancies and the identification of persons
> residing at each address; (4) Lead-Paint Insurance Policies and any
> documents related to or reflecting the existence of Lead-Paint
> Insurance Policies; (5) internal corporate communications,
> including but not limited to meeting minutes from board of
> directors meetings; and (6) any other documents reasonably related
> to Lead-Paint Claims or potential Lead-Paint Claims against the
> Debtors or Non-Debtor Affiliates, including, but not limited to, any
> documents relating to past Lead-Paint Claims, all of which shall be
> maintained in a manner and location mutually approved by the
> Debtors and the Committee.

The Release is collectively included in Articles 9.4 and 9.6 which provide:

> 9.4  Injunction against Certain Actions against Protected Parties. Except as provided otherwise in this Plan or as expressly approved by the Reorganized Debtors in writing, all Holders of Lead-Paint Claims shall be precluded and enjoined from asserting against any of the Protected Parties any Claim for which the Protected Parties are alleged to be directly or indirectly liable for the conduct of, claims against, or demands on any of the Debtors, except for Claims that are based on willful misconduct or gross negligence. Notwithstanding the foregoing or any other provision of this Plan, Lead-Paint Claimants shall be permitted to bring Lead-Paint Claims against the Debtors and Reorganized Debtors, including their present and former employees and officers, for the purpose of establishing the amount of their liability for such Lead-Paint Claims.  Such Lead-Paint Claims shall be non-recourse as against any assets of the Debtors or Reorganized Debtors and their present and former employees and officers, except the Lead-Paint Insurance Policies.

> *       *       *

> 9.6  Release of Directors from Lead Paint Claims.  Upon the Effective Date, each of the Directors of the Debtors, solely in their capacity as such, shall be released from personal liability for any and all Lead-Paint Claims, without prejudice to any of the Lead-Paint Claimants' rights and claims pursuant to all other provisions of this Plan.

The Release benefits the Protected Parties, defined at Article 1.47 to mean, "the Reorganized Debtors, and (ii) present and former employees, directors and officers of the Reorganized Debtors, including Barry Mankowitz, and each of the past and present member [sic] of the Board of Directors of City Homes, Inc...."

The Final Plan also provides for the continued operation and wind down of the reorganized Debtors' business as the real estate is liquidated and for the Debtors ongoing assistance with Insurance Covered Claimants' litigation.  The Final Plan also assumes the

Severance Plan between CH Management and the Debtors' employees, enabling them to receive severance payments when their employment inevitably terminates. *See also* CH Exh. 13.[45]

## V.   Jurisdiction and Venue

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b) and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).  The Court concludes that the entry of a final order in this case will not offend the strictures expressed in *Stern v. Marshall*, 564 U.S. 462 (2011).  Venue is proper under 28 U.S.C. § 1409(a).

## VI.   Analysis, Findings and Conclusions

### 1.   <u>Non-Debtor, Third-Party Releases as a Part of a Chapter 11 Plan.</u>

Before oral argument, the Debtors asserted that,

> This is the rare group of Chapter 11 cases in which all creditors, in large numbers and without exception, agree that the proposed Plan is in their best interest and overwhelmingly voted to accept the Plan. The active participating creditors and other parties in these cases are diverse, with (i) secured creditors owed millions of dollars; (ii) insurance companies, that issued policies that may provide hundreds of millions of dollars of insurance coverage; (iii) the Committee and all of the unsecured creditors, including the Lead-Paint Claimants, they have the fiduciary duty to represent; (iv) the United States Trustee; and (v) the Debtors, which for the past 30 years devoted themselves to CHI's charitable mission of providing affordable housing to low income residents of Baltimore City at below-market rental rates.

Debtors' Post-Hearing Memorandum in Support of Confirmation of [Final Plan] at 1.  (Debtors' Post Hearing Memorandum) (Dkt No. 727).

Further along in the same memorandum, the Debtors' summarized why the Release is warranted:

---

[45] At oral argument, the Debtors proposed to further modify the Final Plan by exempting Uninsured Claimants without notice of this case from the effect of the Final Plan and Release.

> The Plan has been formulated to achieve the best possible way for
> Lead-Paint Claimants to realize recoveries on meritorious claims
> while preserving the rights of the Lead-Paint Insurance Entities.
> To achieve this balanced outcome will require the Debtors (and the
> non-Debtor Affiliates) to sell all of their Properties and to maintain
> all relevant books and records, and for CHI President, Barry
> Mankowitz, to oversee the maintenance and operations of the
> Lead-Paint Litigation Document Repository and to cooperate as
> appropriate in future Lead-Paint Claims litigation.  In addition, the
> members of CHI's board of directors have agreed to continue to
> serve as directors without any compensation.  In exchange for
> these contributions, the Plan provides for the Debtors' directors to
> be released from any personal liability for any Lead-Paint Claims,
> and for Lead-Paint Claimants to be enjoined from asserting any
> claims against any of the Debtors' present or former officers or
> employees.

Debtors' Post-Hearing Memorandum at 14.  The Plan Proponents stress that this idyllic state of affairs virtually binds the Court to confirm the Plan as presented.  The absence of objections is relevant but not controlling, particularly so here where the Uninsured Claimants have not participated in the process.

The Court has an independent duty to decide if the Plan satisfies the provisions of Section 1129 and should be confirmed.  *Williams v Hibernia Nat. Bank (In re Williams)*, 850 F. 2d 250, 253 (5th Cir. 1988); *In re Landscaping Services, Inc.*, 39 B.R. 588, 590 (Bankr. E.D. N.C. 1984). Section 1129(a) mandates that a plan shall be confirmed only if, "all of the following requirements are met."  Section 1129(a)(1) provides that the plan must comply "with the applicable provisions of this title".  Subsection (3) provides that the plan must be, "proposed in good faith and not by any means forbidden by law".  Because the Plan wrongfully provides for non-debtor, third-party relief from liability, the Court cannot find that it either complies with the applicable provisions of Title 11 or it is proposed in good faith.  Instead, the Court concludes that

what the Final Plan proposes to do byway of the Release is devoid of equity and forbidden by law.

The type of non-debtor release sought in this case is not provided for anywhere in the Bankruptcy Code.  In fact, the only relevant express legislative directive is included in Section 524(e) and the plain language of that subsection appears to reject the concept.[46]  Non-debtor, third-party releases are hence a judge-fashioned tool that bestow all the benefits of the discharge and post-discharge injunction upon persons who have not subjected themselves to the Code's rigorous vetting process of personal honesty and financial disclosure.  Nevertheless, the discretionary grant of non-debtor, third-party releases as a part of a Chapter 11 plan has been authorized in this Circuit.  But they cannot be handed out as if they were participation certificates.  This Court believes they are appropriate only upon a significant showing of compliance with the mandated criteria and when the equities fall solidly in the proposed beneficiaries' favor.  At a minimum, that must mean substantially full and fair treatment for the class of claimants targeted by the release.  Conversely, the purely self-serving elements of the intended beneficiaries' case should be taken with a grain of salt and particularly so here in light of the overall circumstances of this case.

The Uninsured Claimants targeted by the Release are not represented by counsel and likely have no actual knowledge of the trap set for their legal rights.  By contrast, the often self-serving assertions of the Plan Proponents have been left largely untested by the lack of an adversarial contest.  Viewed in this light the siren songs of "reconciliation", "unanimity" and "best outcome" sour upon a close listen.  This is so because the Court finds and concludes that (a) not one of the Uninsured Claimants actually participated in this case, let alone gave

---

[46] Companion Section 524(g) deals with post-confirmation injunctions entered for the benefit of liquidating trusts in asbestos cases.

64

overwhelming support to the Release, and (b) the assertion that the Final Plan is, "the best possible outcome" does not overcome the Plan Proponents' utter failure to satisfy the mandatory factors set forth in *NHF I* and *NHF II* that govern the propriety of a non-debtor release. Liquidation *is* the inevitable outcome of this case and after a three year odyssey, no one would argue that is not a "good" outcome", if somewhat late in the day.  But that does not answer the question of whether the Protected Parties, who are unwilling to contribute any personal, material value, should receive the Release while the Uninsured Claimants are stripped of their rights.

The gap between the evidence in this case and the showing required to secure a release is so wide that one might wonder why so much time and money has been expended in the process of advocating solely for the benefit of the Protected Parties.  Indeed, Mr. Werwath admitted at the Confirmation Hearing that the Debtors were fully prepared to *liquidate their assets before they sought bankruptcy counsel*.  Given the inevitability of that outcome, it seems that these reorganization proceedings have only been about positioning the case so releases could be secured for individuals who are not in bankruptcy and the impact of *Jackson v. Dackman*, *supra*, avoided through the back door.  This is not in line with the fiduciary obligations of either the estate or the professionals tasked with safeguarding the best interests of all creditors.

Section 524(e) provides that, "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or property of any other entity for, such debt."  Significant authority has interpreted this subsection as barring the discharge of debts of a non-debtor through a Chapter 11 Plan.  *See Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir. 1985); *Landsing Diversified Properties-II v. First Nat'l Bank & Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592 (10th Cir. 1990).  However, *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694 (4th Cir. 1989), adopted a more

flexible approach for this Circuit.  In *Menard-Sanford*, the Court cited *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987) with approval and held,

> Whatever the result might be as to the application of §524(e) in other cases, we do not think that section must be literally applied in every case as a prohibition on the power of the bankruptcy courts, as appellants would have us apply it here.  In this situation where the Plan was overwhelmingly approved, where the Plan in conjunction with insurance policies provided as a part of a plan of reorganization gives a second chance for even late claimants to recover where, nevertheless, some have chosen not to take part in the settlement in order to retain rights to sue certain other parties, and where the entire reorganization hinges on the debtor being free from indirect claims such as suits against parties who would have indemnity or contribution claims against the debtor, we do not construe §524(e) so that it limits the equitable power of the bankruptcy court to enjoin the questioned suits.

*Menard-Sanford*, 880 F.2d at 702.

Carrying the analysis a step further, the Court of Appeals in *NHF I* approved the use of specified factors to judge the appropriateness of non-debtor, third-party releases in Chapter 11 plans.  *NHF I*, 663 F.3d at 712.  In *NHF II* the Court applied those factors following remand in order to evaluate the bankruptcy court's decision to reject the proffered release.  *NHF II*, 760 F.3d at 347–51.  In *NHF I* the Court held,

> We find the *Dow Corning* and *In re Railworks Corp.* factors instructive and so commend them to a bankruptcy court when considering whether to approve non-debtor releases as part of a final plan of reorganization.  That said, we agree with Appellants that approval of nondebtor releases in this context should be granted cautiously and infrequently.

*NHF I*, 663 F.3d at 712.

The approved factors are,

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete

the assets of the estate; (2) The non-debtor has contributed
substantial assets to the reorganization; (3) The injunction is
essential to reorganization, namely, the reorganization hinges on
the debtor being free from indirect suits against parties who would
have indemnity or contribution claims against the debtor; (4) The
impacted class, or classes, has overwhelmingly voted to accept the
plan; (5) The plan provides a mechanism to pay for all, or
substantially all, of the class or classes affected by the injunction;
(6) The plan provides an opportunity for those claimants who
choose not to settle to recover in full and; (7) The bankruptcy court
made a record of specific factual findings that support its
conclusions.

*Id.* at 711-12; *accord*, *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning*

*Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002).  The Court in *Deutsche Bank AG, London Branch, v.*

*Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136, 142 (2d

Cir. 2005) held that non-debtor releases may only be tolerated upon a showing of "unique"

circumstances.  Likewise, the Court in *Gilman v. Cont'l Airlines* (*In re Cont'l Airlines*), 203 F.3d

203, 212-13 (3d. Cir. 2000) recognized that non-debtor releases may be approved only in

"extraordinary cases".

The Plan Proponents and UST use adjectives like "unique" and "extraordinary" to

describe this case but this Court is left searching for the meritorious reasons that explain why.

None of the facts make it so in the equitable sense that *NHF I* requires.  Indeed the only

extraordinary event the Court can see is the attempt by the Plan Proponents to assert that the

Uninsured Claimants voted overwhelmingly in support of the Release when the reality is none

even participated in this case.  Each relevant element regarding the Release will be reviewed in

turn, but the Plan's first inequity is the unequal classification used to gerrymander the voting to

the improper end of asserting one hundred per cent acceptance by the Class in which the

Uninsured Claimants have been wrongfully placed.

2.    **The Uninsured Claimants Targeted by the Release are Improperly Classified with Insurance Covered Claimants in Order to Artificially Achieve Class Acceptance and Alleged "Overwhelming" Support for the Release.**

The Court raised the improper classification of the Uninsured Claimants in Class 5 at the inception of the Confirmation Hearing.  In response, the Debtors asserted that,

> All Class 5 Claimants are permitted to pursue their Claims in state court to determine the amounts of their Claims.  For those Claimants whose Claims are covered by insurance, they retain their rights to recover from the Lead-Paint Insurance Entities the amounts determined by the state court process or settlement.  Plan, § 4.5.
>
> The Plan does not preclude any Lead-Paint Claimant from electing to participate in the Fund, as opposed to pursuing state court litigation. Conversely, the Plan does not preclude a Lead-Paint Claimant who may not have the benefit of applicable insurance from pursuing state court litigation, as opposed to participating in the Fund.  The Plan permits all Lead-Paint Claimants, without regard to whether a particular Claim is covered by insurance, from choosing one path or the other, in the Claimant's sole discretion.  Accordingly, the Plan treats all Lead-Paint Claimants the same.

Debtors' Post-Hearing Memorandum at 10.

With that foundation, the Plan Proponents assert that the Final Plan has been fairly and unanimously accepted by Class 5A-L.  However, the truth is that all class members are not treated the same either based upon the Final Plan's language or as a practical matter.  As the Uninsured Claimants have been improperly lumped together with Insurance Covered Claimants, the voting results are invalid and bear all the hallmarks of illegitimate class manipulation, or gerrymandering.

Section 1123(a)(4) states that a plan shall, "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  *See Dow Corning Corp.*, 280 F.3d at

659-60 (Section 1123(a)(4) was violated where Canadian governmental agencies accorded far more effective rights than United States); *Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings)*, 407 B.R. 576, 592 (D. Del 2009) (Section 1123(a)(4) violated where plan provided a 100% distribution to some claims in a given class and 130% to other claims in that same class).  In *In re W.R. Grace & Co.,* 475 B.R. 34, 121 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir. 2013), the District Court explained the subsection's equal treatment mandate in these terms: "(1) all class members must be subject to the same process for claim satisfaction . . . (2) all class members' claims must be of "equal value" through the application of the same pro rata distribution or payment percentage procedures to all claims . . . and (3) all class members must give up the same degree of consideration for their distribution under the plan." *(internal citations omitted).*

Applying *W.R. Grace's* test, and plain common sense, it is evident that the members of Class 5A-L are not treated equally by the Final Plan.  As for whether the satisfaction process is equal, Insurance Covered Claimants will have the opportunity to have their claims paid at full value (minus attorneys' fees and costs) through the resumption of state court litigation.  Article 4.5 specifically limits the claims of claimants who opt for state court litigation to "the proceeds of Lead-Paint Insurance Policies applicable to their Lead-Paint Claim".  Conversely, Uninsured Claimants are limited to a *pro rata* payment from the $300,000 fund and then only if they have knowledge of this case and file a claim that beats the two year deadline.  For the same reason, the Insurance Covered Claimants and the Uninsured Claimants do not receive "equal value" under the Final Plan as it is proposed that they receive vastly different distribution or, "payment percentage procedures" – insurance covered recovery by way of litigation *vs.* a *pro rata* share of $300,000.  As for the last factor, an honest evaluation of the degree of consideration given up is

69

irreparably marred by the lack of any knowledge regarding, (a) the identities of the Uninsured

Claimants, (b) the nature and extent of their injuries, (c) a reasonable estimate of their damages

and (d) any potential liability of the Debtors or the Protected Parties.[47]  However, what is certain

is that Insurance Covered Claimants are giving up relatively little – mainly the delay and any

prejudice caused by this reorganization proceeding commenced at the behest of the Protected

Parties – by comparison.  *See In re Aov Indus.,* 792 F.2d 1140, 1152 (D.C. Cir. 1986) ("It is

disparate treatment when members of a common class are required to tender more valuable

consideration … in exchange for the same recovery.").  In short, the Insurance Covered

Claimants are to be paid something that approximates one hundred percent of their claims while

the Uninsured Claimants are not.

Mr. Albright offered a partial justification for the treatment afforded the Uninsured

Claimants: their claims are worthless because no attorney would take them on without the likely

existence of insurance coverage.  Hence, in this view, an attorney's willingness to take on a case

defines the measure of damages and not a person's actual injury.  Thus, *any* payment to an

Uninsured Claimant results in "equal" treatment to that afforded the Insurance Covered

Claimants.  The Court will not buy-in to this brutal logic but instead accepts Mr. Mankowitz's

frank testimony (supported by the Court's own research summarized in Section III, above) that

blood level elevation is the real measure of personal injury.  Even the Final Plan concedes this

*sub silento* by acknowledging the $300,000 fund will be distributed *pro rata*, meaning total

claims would likely exceed the available dollars.  This emphasizes the unequal treatment within

the Class and adds up to a violation of Section 1123(a)(4).  The Court concludes and finds that

this disparate treatment was engineered in order to wrongfully gerrymander the voting process.

---

[47] It was the duty of the Plan Proponents to include such information in their disclosure statement.

In order to achieve confirmation, at least one impaired class had to vote in favor of the Modified Plan. Section 1129(a)(10). Section 1122(a) provides that except to the extent a proper administrative convenience class is created, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." When a plan proponent has wrongfully classified claimants substantially similar to other, separately classified claimants in order to override the anticipated impact of a controlling creditor who will likely vote in the negative, and thus secure an affirmative, impaired voting class, the conduct is called gerrymandering and Section 1122(a) should be applied as a bar. *Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991); *In re Hyatt,* 509 B.R. 707, 718 (Bankr. D. N. M. 2014); *In re Bloomingdale Partners,* 170 B.R. 984, 995 (Bankr. N.D. Ill. 1994). The Plan Proponents here have engaged in a reverse, inclusive version of this tactic.

Class 5A-L is designated as impaired by the Modified Plan.[48] The *only* votes in this Class were recorded through Master Ballots submitted by attorneys who represent Lead-Paint Claimants.[49] Mr. Albright emphatically testified that no attorney in this field would represent a client without the likely expectation of insurance coverage for the claim. In light of that, the Court concludes that all of the Master Ballot claimants and their counsel believe their Claims are covered by insurance. Viewed another way, the Court has repeatedly asked the Plan Proponents to identify an Uninsured Claimant actually participating in this case. Mr. Mankowitz easily drew

---

[48] The secured classes, all of whom hold non-recourse loans, are also designated as impaired but they could not reasonably ask for any better treatment under the Final Plan – the liquidation of their real estate collateral with their liens to attach to the net proceeds of sale. In that way, they receive the full value of their secured claims as defined by both the market place and Section 506(a)(3) and arguably are not in fact impaired. By contrast, unsecured trade creditors are not designated as impaired and are likewise being paid in full.

[49] *See* CH Exh. 10. No ballots were filed by unrepresented persons.

the line of demarcation in his testimony: pre – 1999 occurrences are likely covered by insurance

while post – 1999 occurrences are not.  Yet, when it comes to identifying an actually

participating Uninsured Claimant, the answer from Counsel for the Plan Proponents has either

been that to do so would risk voiding insurance neutrality or that it is simply impossible.[50]  The

Court concludes that in light of the POCs filed, and the overall record of this case, the real

answer is there has been no actual participation by Uninsured Claimants.  The Court therefore

finds and concludes that, the Plan Proponents included the Uninsured Claimants in Class 5A-L,

in order to insure their "acceptance" of the Final Plan and "overwhelming support" for the

Release byway of the dominant strength of the Master Ballots.  This is the only reasonable

conclusion in light of the grossly disparate treatment afforded the two different sets of claimants.

Thus, the distinct claims and potentially differing interests of the unrepresented, Uninsured

Claimants were nullified by the impact of the Master Ballots.[51]

     The claims of the Uninsured Claimants are not "substantially similar" to those of the

Insurance Covered Claimants.  While it is true that their claims derive from the same root cause

of potential lead paint poisoning, the difference between them – whether they were tenants in the

Debtors' premises either before or after 1999 – is like night and day and especially in view of the

markedly different treatment afforded by the Final Plan.  To properly respect the huge difference

between the two classes of claimants – whether they might rely upon and recover insurance

proceeds for their injuries or not – the Uninsured Claimants should have been separately

classified.  Because they were not, the Court finds that the Final Plan violates §§ 1123(a)(4) and

---

[50] It was never explained how the identification of a participating Uninsured Claimant – someone who lived in one the Debtor's residence after 1999 and is asserting a lead paint poisoning claim – would violate insurance neutrality.

[51] The Court likewise concludes that the Uninsured Claimants were not "represented" by the Committee or its members.  *See* Section VI.6, *infra.*

1122(a) and therefore cannot be confirmed.  However, the greater reason to deny confirmation

are the huge inequities that underlie the Release.

### 3. The Slim Identity of Interest Created by the CHI's Duty of Indemnification is an Insufficient Basis to Warrant the Release.

As stated in *NHF II*, a release may be appropriate when an indemnity provision is

present, "because a suit against the non-debtor may, in essence, [be] a suit against the debtor that

risks deplet[ing] the assets of the estate".  *NHF II*, 760 F.3d at 348 (internal quotations omitted).

The Plan Proponents assert there is an identity of interest between the Debtors and the Protected

Parties sufficient to justify the Release.  This contention is based upon CHI's Bylaws which

include CHI's duty to indemnify "directors, officers and employees" with respect to litigation

contemplated or filed against them and arising out of their work for CHI or other entities or

"enterprises" presumably related to CHI, when done at CHI's request.  CH Exh. 4.  There was no

evidence of any like clauses that create a duty to indemnify between the Protected Parties and the

other Debtors and Affiliates.  Hence, while CHI may have a duty to indemnify, this direct

obligation does not exist for the other Debtors and Affiliates.  Moreover, the Court concludes

that in this instance the limited, potential right to indemnification is a factor without substance.

When a plan provides for a reorganized debtor to carry on with business as usual, there

may be an essential need to guard against a significant, unanticipated depletion of assets brought

about by ongoing litigation and a duty to indemnify.  However, the Plan in this case is a

liquidating plan in every sense.  That means the Debtors will engage in ordinary operations only

long enough to merge the Affiliates into CHI and convert their combined real estate into cash

through a controlled sell-out that would last less than a year.  Likewise, Insurance Covered

Claimants will be permitted to continue their state court litigation unabated.  Notwithstanding its

length and detail, the Plan is a terse acknowledgement that the Debtors cannot continue as a going concern.[52]  The Plan Proponents' assertion that inordinate damage will be suffered by the Debtors due to indemnification claims is therefore illusory in light the Plan's proposed reality. And at best, the damage would only be suffered by CHI (and perhaps the Affiliates merged into it) as it is the only Debtor with a duty of indemnification.

The only evidence offered as to the likelihood of future claims was Mr. Werwath's speculation, heard "second hand", that there may be "hundreds" of such claims in the pipeline, without any detailed explanation as to why he believes that to be the case.  This is in stark contrast to Mr. Albright's assertion that, (a) he would never file a claim that is likely uninsured and (b) any claim against the Directors would be virtually meritless.  There was no evidence offered of any claims filed (or even threats of claims) against the Protected Parties over the three years that these cases have been pending.  The Debtors asserted early on that some of the claims they sought to enjoin were uninsured.  *See* Dkt. No. 77.  However, this was not supported by confirmatory evidence then and none was presented at the Confirmation Hearing.  Mr. Mankowitz discussed a handful of uninsured claims that were filed over the years and how they were resolved.  But there was no evidence submitted that would tend to confirm there is a reasonable expectation of massive litigation against the Protected Parties such that the indemnification clause would be triggered in a significantly injurious way.

Indemnification clauses are standard corporate fare.  To the extent they have been recognized as one of the necessary elements in support of non-debtor, third-party releases, then the existence of CHI's duty to indemnify falls lightly in the Protected Parties favor.  But this is

---

[52] Mr. Werwath's testimony as to their willingness to liquidate before consulting with Mr. Vidmar confirms this truth as of the Petition Date.

74

so only as it applies to CHI and only upon shaky, speculative grounds.  Beyond that, Article 6.01 of CHI's By-laws cannot withstand the vast weight of the Plan Proponent's failure to satisfy the remaining factors.

    **4.**     **The Protected Parties Do Not Propose to Make a Substantial Contribution to the Final Plan.**

The Protected Parties do not propose to contribute any personal assets or other material value to the Final Plan.  The evidence at the Confirmation Hearing was undisputed in this regard.  Nevertheless, it is asserted that (1) the "waiver of charitable immunity", (2) the contribution to the Plan of assets owned by other Debtor entities and affiliated non-debtors and (3) the Protected Parties willingness to continue to serve as either directors, employees, or, in the case of Mr. Mankowitz, an officer, are collectively sufficient to satisfy this element.  The Court does not agree.

The Court is perplexed by how a "waiver of charitable immunity" equates with a valuable, substantial contribution in the context of this Chapter 11.  As regards the Debtors, if such immunity exists, it only applies to CHI, the single entity with IRS approved charitable status.  Moreover, as the Debtors voluntarily sought relief under Chapter 11, their assets *must* be made subject to the superior Chapter 11 statutory scheme in order to exit by way of a confirmed plan.  In other words, the Bankruptcy Code takes precedence now and the Court would not confirm a plan with assets and rights withheld under the veil of "charitable immunity" if it did not otherwise adhere to the strictures of Section 1129.  Do the Plan Proponents contend that CHI could refuse to waive charitable immunity and still achieve a confirmed plan that shields the equity in its assets from creditor claims?  If so, that would be a queer, losing argument.  Hence, there is no value in the alleged "waiver" of charitable immunity.

Moreover, under the Final Plan the real estate assets of the Affiliates are to be moved into CHI (the only entity that does not hold title to any real estate) through merger. Would it be fair and equitable to allow the real estate assets of the Affiliates (or any of the other Debtors) to be merged into CHI so charitable immunity can be bestowed before "waiving" that immunity to then find a substantial contribution?[53] The Court will not buy into this pretzel-shaped logic. Mr. Albright did not put much store in the "value" of a waiver of charitable immunity, stating that the mere raising of it is "not the end of the inquiry". In other words, a deeper analysis would be required to determine whether, and for whose benefit, the doctrine applies – and presumably the value of the waiver, if any – and such an analysis did not occur in either the Amended DS or during the Confirmation Hearing. In any event, the basis for any charitable immunity that exists only expressly belongs to CHI through its IRS approved exempt status and not the Protected Parties. Hence, the waiver of charitable immunity is not their consideration to give. They do not get credit for a substantial contribution they do not own.[54]

As for the contribution of the real estate assets owned by the Debtors (and not the Protected Parties), the jointly administered estate has no choice but to utilize the quantum of its available assets. The utilization by the Debtors of their assets to attempt to secure confirmation does not take on the character of some beneficent act just because the Protected Parties want the Release. In Chapter 11, a hopeful Debtor *must* use its assets to fund its plan for the benefit of its creditor body. As for the Affiliates, as they are all connected in a like manner to CHI and under its ultimate control, and as there would not be enough equity to fund the Final Plan without the

---

[53] The arguments included in the Plan Proponents' papers seem to suggest a merger of all Debtors into CHI. Yet, the Final Plan limits the merger to only the Affiliates with the other Debtors maintaining their separate existence. Articles 5.1 and 5.2.

[54] On the other hand if the Protected Parties are charitably immune in their own right under Maryland law, then they do not need the Release. In that instance, they would not be making a substantial contribution but only trading one coat of armor for another by gaining the Release.

Affiliates' contribution of their assets, it is impossible to envision a lawful exit from reorganization without using their real estate. Finally, as with the so-called waiver of charitable immunity, as the real estate is owned by the Debtors and the Affiliates and not the Protected Parties the real estate is not the Protected Parties to contribute.

The willingness to continue to serve as either Directors of CHI, or employees of CH Management and the other Debtors and Affiliates, is likewise insufficient. As stated by the bankruptcy court upon remand after *NHF I*, "officers and directors, all of whom are insiders, performed their duties either because they were paid to do so . . . or because they had a fiduciary obligation to do so . . . ." *In re Nat'l Heritage Found*., 478 B.R. 216, 229 (Bankr. E.D. Va. 2012). This Case presents precisely the same situation. Messrs. Werwath and Mankowitz essentially presented this element in this fashion: if we don't get a release then we won't carry on with the Debtors. While the Court understands their personal viewpoint, an equitable hurdle will not be successfully cleared in this way.

No information was provided as to the personal assets of the Protected Parties and what valuable, good faith contributions they might be able to make to either the Final Plan generally or the $300,000 fund set aside for the Uninsured Claimants. Without either that information, or some significant, valuable, material contribution that makes a difference, the Court cannot approve the Release. Mr. Mankowitz's decision to donate his severance pay comes too late in light of the overall equities and does not solve the mystery of what might be contributed by all the Protected Parties, some of whom still stand to receive the full balance of their severance payments under the Final Plan. This Court concludes that a substantial contribution must entail valuable consideration, personally contributed or made possible by those who desire the release, which enhances the reorganization's asset base to the benefit of the impacted creditors. That is

77

not the situation here. Accordingly, this element is not satisfied and does not support the grant of the Release.

5.    <u>**The Release is Not Essential to the Debtors' Reorganization.**</u>

This factor usually hinges upon the likelihood that litigation will be prosecuted against the non-debtors and whether either the non-debtors' demands for indemnification, or the stress-filled, personal wages of litigation fatigue, will cripple the reorganized debtor's ability to function. Much of what the Court concluded with respect to the "identity of interest" element applies with respect to this factor. Beyond Mr. Werwath's brief, second-hand speculation, there was no solid evidence presented of any approaching storm of litigation against the non-debtors and not even a hint of any litigation filed (or threatened) during the three years these cases have been pending. Mr. Albright testified that cases filed against the Directors would be virtually meritless and cases filed against Mr. Mankowitz would be expensive with the likely prospect of uncollectible judgments. Moreover, there was no evidence at all regarding the identity of prospective claimants, the nature of their claims or the quantum of their damages. Without that, the Court is in no position to rationally evaluate the likelihood of future litigation by the Uninsured Claimants against the would-be Protected Parties and the impact that it could have upon the Debtors. As the Final Plan contemplates liquidation of the real estate and the termination of ongoing business within less than a year, there would be even less reason for the Debtors to fear the effect of indemnification claims. Per the Final Plan, the Debtors' real estate would be sold in about nine months and assistance with the state court litigation would be the only real activity remaining. The provisions of the Final Plan would govern priority of payment, and indemnification claims would not trump the administrative costs of winding the Debtor down. Mr. Werwath and Mr. Mankowitz testified that the Release is essential because if the

78

Court *does not grant it*, (1) CHI will not contribute its assets (or the assets of the Affiliates) to the Plan and (2) the Protected Parties will resign. Again, the answer to this question cannot hinge upon how effectively the plan proponents manage to force the object of their desire. There was no evidence of any litigation of the type in question pending against the Protected Parties and there was no reliable, non-speculative evidence that any is a certainty in the future. In the absence of such evidence, this element is not satisfied and the Release will not be granted on this basis.

### 6.  The Class Impacted by the Release Did Not Vote Overwhelmingly in Favor of the Release.

The Plan Proponents assert that the 100% favorable vote of Class 5A-L satisfies this element. The Court sees it differently. The evidence unequivocally establishes that the *actual people* who will be impacted by the Release – the Uninsured Claimants – are *not* represented in this case, were *not* placed in a separate class notwithstanding their markedly different status and treatment from the Insurance Covered Claimants and were *not* given an actual opportunity to accept or reject the Release. All of the POCs filed in this case that assert lead paint injuries were filed by attorneys on behalf of their clients, who were plaintiffs in pending, prepetition litigation. The Master Ballots cast in favor of the Modified Plan were cast by attorneys who represent lead paint claimants. Mr. Albright emphatically testified that no attorney in this field would knowingly represent a lead paint claimant whose claim appears lacking insurance coverage because there would be no sure likelihood of the recovery of attorney's fees and costs, let alone damages. The representative members of the Committee are all attorneys who represent lead paint claimants in pending litigation. Mr. Mankowitz testified that since 1999, approximately 60

tenants from about 300 lead paint infested residences vacated the Debtors' premises every year.[55]
Notwithstanding the Court's pleas, the Plan Proponents could not identify a single, individual,
participating Uninsured Claimant.  Yet, in spite of all this the Plan Proponents assert that the
Uninsured Claimants were represented by the Committee beneath its fiduciary umbrella.  The
Court concludes instead that Class 5A-L was controlled by the attorneys who represent Insurance
Covered Claimants and there was neither actual knowledge, nor participation, of the Uninsured
Claimants targeted by the Release.  The Court is not prepared to eviscerate the rights of a
potentially expanding group of citizens not actually represented in this case by eliminating their
right to file a claim in the state court against whoever may have potential liability in the name of
"equity".

The Plan Proponents assert that the authorized notice by publication per the Voting,
Solicitation and Notice Order has the effect of honoring due process and foreclosing the balloting
process in favor of the Final Plan.  However, in light of the entire record, the Court concludes
that the notice by publication employed as a part of the confirmation process cannot be a
substitute for actual knowledge, representation and voting by the Uninsured Claimants where the
end game is so unorthodox, severe and calculated.  The short answer to the argument is that
while constructive notice may be warranted in a narrow sense with respect to the *Debtors'*
relationship with their creditors, the Court will not sustain constructive notice as a tool to govern
the relationship between the non-debtor, *Protected Parties* and their potential creditors.  This is
not the Protected Parties' reorganization proceeding and upon deep reflection the Court is

---

[55] Mr. Mankowitz urged the Court to believe that potential claimants would know of the Debtors' potential liability
for lead-paint poisoning claims generally through the Debtors' own education and prevention efforts, attorney
advertising and the like.  This was of course his lay opinion based upon experience and belief.  Nevertheless, it is
irrelevant to the degree of actual knowledge possessed by a potential claimant with respect to (a) this case and (b)
the Release.

unwilling to extend the limits of *Mullane v. Cont. Hanover Bank & Trust Co.*, *supra*, and its progeny to their benefit in light of the overall equitable concerns regarding the grant or denial of the Release.

Accordingly, as it appears constructive notice has been utilized to pull the rug out from under the Uninsured Claimants to the direct benefit of the Protected Parties, it was error to enter the Voting, Solicitation and Notice Order and it must be vacated. The improper and unequal classification in Class 5A-L that led to the domination of the Unsecured Claimants by the Master Ballots is reason enough to take that action. So too is the Debtors' strange reluctance to thoroughly scour its records to track down former tenants during the pre-confirmation phase to try and provide them with actual notice.[56] But more than anything, the *vacatur* is warranted by the Committee's lack of truly zealous representation on behalf of the Uninsured Claimants. Notwithstanding the Committee's protestations, the Court cannot find that it honored its fiduciary obligation. The Court does not attribute evil motives to the Committee. But the record strongly supports a lack of the requisite level of unfettered, loyal analysis.

As explained above, the attorneys who represent the individual members of the Committee must believe there is insurance coverage for their clients. The representative attorneys' interests would thus be governed first and foremost by the goal of getting the insurance-based litigation back on track for their clients while surrendering as little as possible in the process. That goal was accomplished in the Final Plan. On the other hand, without one single Uninsured Claimant actually participating, it would be easy to call such claims worthless (without any knowledge of specific facts or elevated blood levels) and agree to a release of liability for the Protected Parties that will have little if any impact on the value of the claims of

---

[56] Even actual notice would likely have been ineffectual in light of the gerrymandered voting.

Insurance Covered Claimants.  In fact, to vociferously argue that the personal injury claims of approximately 1,000 or more voiceless and nameless citizens should be released for a $300,000 *pro rata* escrow fund with a one-year claims filing deadline with knowledge of the extremely high legal standard set in *NHF I* and *NHF II* is reason enough to conclude that at best, the Committee's fiduciary vision became clouded.  Mr. Maclay said that it would be "impossible" to know who fits within the class of Uninsured Claimants.  Without that, the Court must conclude that neither the Committee members nor the attorneys who cast the Master Ballots represent any Uninsured Claimants and to the extent there may have been a fiduciary obligation, it was not honored.  Indeed, at the point the Release was interposed in the negotiations, a conflict arose between the interests of the attorneys as Committee members charged with representing all unsecured creditors and as representatives of their individual clients.  It was not artfully resolved.

The devaluation of the Uninsured Claimants' interests is evident.  Mr. Albright testified that the surrender of the Release in exchange for the $300,000 fund was either a "throwaway" or relatively meaningless in light of the negligible value attached to the claims of the Uninsured Claimants.  And this in the context of a negotiated result by the Committee that would have allowed all of the Protected Parties to also retain their severance packages (collectively greater than $300,000) in potential violation of Section 1129(b) to the further detriment of the Uninsured Claimants.[57]  While Mr. Albright valued the Uninsured Claimants' claims by the degree to which an attorney would be willing to represent any of them, Mr. Mankowitz testified that lead paint damages are, in simple terms, determined by the level of toxicity in the blood.  The Court concludes that the latter measure is the one that actually accounts for the individuals' damages as

---

[57] Assuming that the Uninsured Claimants had been properly, separately classified and any had received direct actual notice and voted, the Plan Proponents may have been proffering a plan scheme that *prima facie* violated the absolute priority rule by allowing the severance payments before the Uninsured Claimants were paid in full.

opposed to the institutionalized unfairness and inequalities of our justice system.  And in this regard, the Plan Proponents put on absolutely no evidence whatsoever as to the claims of any actual Uninsured Claimants' – the identity of claimants, their actual number, or the substantive damages suffered by them.  Finally, Mr. Albright testified that by far the most important item to be gained in the eyes of the Committee was the document repository established by the Final Plan.  He explained that his clients usually do not have copies of their leases and they are the "gold standard" as regards proof of past residency in the Debtors' premises.  He also testified that the relevant documents might "scatter to the four winds" if the Modified Plan was not confirmed.  The maintenance of the document repository was therefore viewed as a great prize and worth it in exchange for a Release that does little to affect the rights of Mr. Albright's actual clients.

The truth is, creditors have an absolute right to review and examine the documents and records of the Debtors and the inclusion of that right in the Final Plan is simply an expression of what the law otherwise requires.  It is not a "prize", and far from it.  The books and records of the Debtors are estate property.  *See* Section 541(a).  If they are destroyed or concealed at this juncture, then their destruction or concealment would be a bankruptcy crime.  *See* 18 U.S.C. § 152(1) (8) and (9).  If there was a reasonable basis to believe that such acts occurred, the Court would not hesitate to refer the matter to the U.S. Attorney's Office for such action as he deemed fit.  But barring that precipitous action, Mr. Albright's touting of this element as a major negotiating stroke boils down to no more than the Committee's willingness to accept nothing in

83

exchange for something when the impacted interests of the Uninsured Claimants are the "something" given away.[58]

For these reasons, the Court cannot find that the interests of the Uninsured Claimants were represented in this case. Because their interests were not properly classified, were not represented, and none voted on the Modified Plan, the Court cannot find that the Uninsured Claimants supported the Release at all, much less in an overwhelming fashion.

### 7. The Uninsured Claimants are not Being Paid All, or Substantially All, of their Claims Under the Final Plan.

The Plan Proponents assert that the $300,000 fund satisfies this element because the claims of Uninsured Claimants are practically worthless.[59] Hence, any payment is better than no payment and that adds up to "substantial" payment. And this is true only if a claim is filed before the one year deadline, later expanded to two. The Court does not agree with the Plan Proponents.

To satisfy this element, the Plan Proponents have the burden of establishing at a minimum the pool of likely claimants and the value of their claims. But they could not do so. Instead, the claims are all characterized as worthless. The Court finds and concludes that the true measure of damages is governed by the level of blood toxicity from lead. The Plan Proponents offered no evidence as to either the total number of Uninsured Claimants or the real, total value of their claims properly measured. Without that proof, there is no way of knowing whether $300,000 can satisfy the total amount of claims of Uninsured Claimants and this element cannot be satisfied.

---

[58] The onus should not fall entirely upon the Committee. The Debtors are only charged with fiduciary responsibility and the question must be asked at what point did the interests of the Protected Parties become primary and how is that challenge resolved ethically?

[59] If that is the case, then why is the Release even necessary?

**8.     The Final Plan Does Not Provide an Opportunity for Uninsured Claimants to Recover in Full Outside of the Final Plan.**

The goal of the Final Plan is to bar payment from any source other than the Final Plan. This treatment is the antithesis of what is required by *NHF I* and *NHF II*. *See In re Nat'l Heritage Found.*, 478 B.R. 216, 232 (Bankr. E.D. Va. 2012). If the Final Plan is confirmed, Uninsured Claimants would be barred from proceeding either in state court against the Debtors (because they lack insurance coverage) or against the Protected Parties due to the Release. Hence, their sole option would be to file a claim within two years and take whatever *pro rata* distribution is available. This is not what the law mandates and without a realistic alternative means of payment in full for Uninsured Claimants outside of the Final Plan, the Release cannot be approved.

**9.     Other Equitable Factors.**

In addition to the NHF I and II factors, the Court finds that the following circumstances likewise justify the rejection of the Release and denial of confirmation:

a.     The Maryland Court of Appeals ruled in *Jackson v. Dackman*, *supra*, that to enforce the statutory immunity provision that capped individual lead-paint damages at $17,000 would be to violate the Constitutional right of an injured individual. The Court concludes that is precisely the result sought here by the Plan Proponents through the Release with respect to the Uninsured Claimants. Without debating the potential interplay between constitutional and bankruptcy law, as a matter of equity, the Court will not be a party to that deprivation.

b.     Mr. Werwath testified that the Debtors first saw a need for a severance plan in 2008 as a result of having to lay-off an employee for reasons other than for "cause". However, the Severance Plan did not come into being until May 2013, around the time he testified that the Debtors' leaders sought liquidation advice from Mr. Vidmar. Moreover, if enforced to the fullest extent as originally planned, the Severance

Plan would pay out approximately $100,000 more collectively in value to the employee members of the Protected Parties than the entire $300,000 *pro rata* fund. *See* CH Exh. 14. In the context of the numerous inequities spelled out in this Opinion, allowance of the Severance Plan would simply be outrageous.

c.    During the run-up to the Confirmation Hearing, the Court was deeply concerned about the quality of notice given to tenants who had vacated the Debtors' premises since 1999. In attempting to enforce the mandate of *Mullane v Cent. Hanover Bank & Trust Co.*, *supra*, and *In re J.A. Jones, Inc.*, *supra*, the Court was hopeful that the Debtors would be enthusiastic about the required search of their own business records in order to insure the best possible, actual, notice. This is particularly so in light of the Debtors' realization that they may have had contact information for Unknown Tenants and the equitable nature of the Release sought by the Protected Parties. Instead, the Debtors complained that the effort would be "impracticable" and "unduly burdensome" and sought to limit the scope of the search to the narrowest range possible. Yet, when Mr. Crosby filed his paper against the Debtors on the eve of the Confirmation Hearing, the Debtors doggedly scoured their business records to try and determine whether he had ever been a tenant or a creditor. *See* CH Tr. at 41-42. In other words, the Debtors knew how to search their records when properly motivated. The Debtors lost significant equitable footing as a result of their reluctance to try and give actual, instead of constructive, notice to the very people whose rights they were seeking to thwart.

d.    Now that the evidence has been received and evaluated, the Court is convinced that the Second Amended DS should not have been approved and the Voting, Solicitation and Notice Order should not have been entered. The failings of both are sprinkled throughout this Opinion. Suffice to say here that, (1) the Second Amended DS did not account at all for either the identity and claims of the Unsecured Claimants or the personal finances of the Protected Parties sufficient to provide adequate information and (2) the Voting, Solicitation and Notice Order was intended to negate the Uninsured Claimants' interests through inappropriate classification and the use of the Master Ballots.

Combined with the defects identified throughout this Opinion, these factors compel the rejection of the Release and the denial of confirmation.

**10.   Because Liquidation is Inevitable, the Debtors' Leadership will not Function Without the Release and the Final Plan is an Unseverable, All or Nothing Proposition that Cannot be Confirmed, a Trustee Must be Appointed to Wind-up the Debtors' Affairs.**

The liquidation of the Debtors' assets is as inevitable now as it was from the Petition Date.  The Release, and the unlawful manipulation of the Uninsured Claimants' class impacted by it, renders the Plan Proponents' conception of reorganization untenable.  Mr. Mankowitz and Mr. Hershey both testified that either the appointment of a trustee or conversion to Chapter 7 would be disastrous but neither are lawyers or bankruptcy experts.  Mr. Mankowitz made his dire prediction on the grounds that no one would be willing to manage the lead pain infested real estate.[60]  However, Mr. Cooper testified that the presence of lead paint would not affect the ready willingness of buyers to purchase the real estate.  If Mr. Cooper is off-base, then all of his (and the Debtors') glowing predictions as to how well the real estate will sell would be incorrect.  One of these opinions must be wrong and, taking into account the quantum of the competing self-interests, the Court concludes that Mr. Cooper's is the correct one.[61]  As for Mr. Hershey, he provided no detailed reasons in support of his non-expert opinion and his opinion will be discounted accordingly, especially in light of the Court's 34 years of experience in this field and the knowledge that many a tougher case has passed through the fires of bankruptcy with results that are reasonable, and often quite admirable, under the circumstances.  The District of

---

[60] Trustees in bankruptcy are not individually liable when operating an insolvent business unless they act outside of their authority or commit gross or intentional wrongs.  *Yadkin Valley Bank & Trust Co., v McGee,* 819 F. 2d 74, 76 (4th Cir. 1987); *U.S. v Sapp,* 641 F.2d 182, 184-185 (4th Cir. 1981).

[61] Mr. Cooper and his firm are proposed to be the Debtors' sales agents.

87

Maryland is blessed with a savvy, diligent, expert panel of trustees along with other world-class liquidation experts and the Court is confident that while there may be challenges, liquidation will be managed in the best possible manner.  The Committee complained in its papers of a potential loss of significant value if the Final Plan is not confirmed.  That is little justification to ignore the law and grant the Release.  More to the point, the past eight years has shown a marketplace rebound from the Great Recession that is well nigh miraculous, in view of those dark days.  With the prudent guidance of a trustee, the Court is confident the asset values will continue to be buoyed and redound to the estate's benefit and hopefully before the next cataclysmic market event.

It is too bad that the Chapter 11 must end this way but the parties have left the Court with no reasonable alternative.  The Court was impressed with the Debtors' history and legacy and especially with Mr. Mankowitz's honest, forthright testimony.  He answered the Court's questions straight-on and truthfully.  Nevertheless, to grant a non-debtor release in this case would set a precedent for granting a release in any Chapter 11 case, just for the asking.  That is not a result warranted by law and therefore confirmation of the Final Plan will be denied and a trustee appointed.

**End of Opinion**

# APPENDIX I

## DEBTORS' REAL ESTATE

| DEBTOR/ OWNER | PROPERTY DESCRIPTION | ESTIMATED MARKET VALUE |
|---|---|---|
| City Homes III | 2205 McElderry Street, Baltimore, MD 21205; 725, 1717and 1719 Baker Street, Baltimore, MD 21217; 1520 North Bruce Street, Baltimore, MD 21217; 1004, 1006 and 1712 North Calhoun Street, Baltimore, MD 21217; 1307, 1419, 1558 and 1637 North Fulton Avenue, Baltimore, MD 21217; 1607, 1615 and 1804 Laurens Street, Baltimore, MD 21217; 1212, 1302, 1310 and 1413 Mosher Street, Baltimore, MD 21217; 1707 and 1715 Presstman Street, Baltimore, MD 21217; 2203, 2206, 2230 and 2233 Henneman Avenue, Baltimore, MD 21213; 1715 McKean Avenue, Baltimore, MD 21217; 506, 508, 512 and 514 North Duncan Street, Baltimore, MD 21205; 2113 East Chase Street, Baltimore, MD 21205; 2222 Prentiss Place, Baltimore, MD 21205; 1831 Riggs Avenue, Baltimore, MD 21217; 1708 and 1718 Lorman Street, Baltimore, MD 21217 | $334,560 |
| Bretton | 3641, 3701, 3707 and 3711 Greenmount Avenue, Baltimore, MD 21218 | 738,000 |
| East Business Trust | 404 North Duncan Street, Baltimore, MD 21231 (demolished); 517 North Madeira Street, Baltimore, MD 21205 (demolished); 2006, 2022 2106 and 2110 East Biddle Street, Baltimore, MD 21213; 2123, 2125, 2208, 2215 and 2240 East Chase Street, Baltimore, MD 21213; 1030, 1032, 1036 and 1040 North Collington Avenue, Baltimore, MD 21205; 510, 520 and 522 North Duncan Street, Baltimore, MD 21205; 2202, 2204, 2210 and 2235 Henneman Avenue, Baltimore, MD 21213; 2239 McElderry Street, Baltimore, MD 21205; 422,504 and 1002 North Patterson Park Avenue, Baltimore, MD 21205; 2204, 2230, 2236 and 2237 Prentiss Place, Baltimore, MD 21205 | 307,840 |
| Johnston Square | 800, 802, 804, 806, 808, 810, 812, 814, 816 and 818 East Eager Street, Baltimore, MD 21202; 1002-1022 and 1024 Hillman Street, Baltimore, MD 21202; 1003, 1005, 1007, 1009, 1011, 1013, 1015, 1017, 1019, 1021, 1023 and 1025 Homewood Avenue, Baltimore, MD 21202 | 992,960 |
| Newington | 1336 North Carey Street, Baltimore, MD 21217; 511 and 513 North Gilmor Street, Baltimore, MD 21223; 710 Newington Avenue, Baltimore, MD 21217 | 111,360 |
| Ocala | 2300 and 2302 Ocala Avenue, Baltimore, MD 21215; 2900, 2902 and 2904 Reisterstown Road, Baltimore, MD 21215 | 738,000 |

| DEBTOR/ OWNER | PROPERTY DESCRIPTION | ESTIMATED MARKET VALUE |
|---|---|---|
| Patriots II | 1302 and 1307 Ensor Street, Baltimore, MD 21202; 2501 West Fairmount Avenue (garage), Baltimore, MD 21223; 853 West Fayette Street, Baltimore, MD 21201; 424 East Federal Street, Baltimore, MD 21202; 1809 East Federal Street, Baltimore, MD 21213; 303 Fonthill Avenue, Baltimore, MD 21223; 2418 Francis Street, Baltimore, MD 21217; 305 and 332 South Franklintown Road, Baltimore, MD 21223; 311, 543 and 608 North Fulton Avenue, Baltimore, MD 21223 | 190,080 |
| Peabody | 18 West 27th Street, Baltimore, MD 21218 | 438,000 |
| Royalton | 1900 Maryland Avenue, Baltimore, MD 21218; 102 West North Avenue, Baltimore, MD 21201 | 278,000 |
| West Business Trust | 1711 and 1838 West Baltimore Street, Baltimore, MD 21223; 3611, 3612 and 3616 West Belvedere Avenue, Baltimore, MD 21215; 923 and 933 Bennett Place, Baltimore, MD 21223; 2022, 2209, 2224, 2234 and 2236 Booth Street, Baltimore, MD 21223; 2112, 2114, 2116, 2132, 2138, 2140, 2148, 2528, 2533, 2535, 2537, 2540, 2544, 2552, 2554, 2555, 2556, 2558 Boyd Street, Baltimore, MD 21223; 29, 112 and 119 South Calverton Road, Baltimore, MD 21223; 2027 Christian Street, Baltimore, MD 21223; 1558 and 2106 Clifton Avenue, Baltimore, MD 21217; 1109 North Carey Street, Baltimore, MD 21217; 3635 Cottage Avenue, Baltimore, MD 21215; 2650 Dulaney Street, Baltimore, MD 21223; 1815, 1827, 1829 and 1839 Eagle Street, Baltimore, MD 21223; 2531 and 2533 Emerson Street, Baltimore, MD 21223; 2601 West Fairmount Avenue, Baltimore, MD 21223; 302, 304, 306, 315 and 326 South Franklintown Road, Baltimore, MD 21223; 2508 Frederick Avenue, Baltimore, MD 21223; 3038 Garrison Avenue, Baltimore, MD 21215; 2633 Hafer Street, Baltimore, MD 21223; 2021, 2022, 2032, 2114, 2121, 2123, 2125, 2127, 2133, 2137, 2145 and 2153 Hollins Street, Baltimore, MD 21223; 2857 and 2858 Lanvale Street, Baltimore, MD 21216; 1932 Lauretta Avenue, Baltimore, MD 21223; 1104 and 2501 West Lombard Street, Baltimore, MD 21223; 1504 McHenry Street, Baltimore, MD 21223; 1809 McKean Avenue, Baltimore, MD 21217; 4808, 4814 and 4905 Palmer Avenue, Baltimore, MD 21215; 4638 Pall Mall Road, Baltimore, MD 21215; 2719 West North Avenue, Baltimore, MD 21216; 3802 and 4044 Park Heights Avenue, Baltimore, MD 21215; 14 South Payson Street, Baltimore, MD 21223; 1561 and 1571 Richland Street, Baltimore, MD 21217; 1936 and 2012 Ridgehill Avenue, Baltimore, MD 21217; 4, 6 and 8 North Stockton Street, Baltimore, MD 21223; 1114 West Saratoga Street, Baltimore, MD 21223; 225 South Stricker Street, Baltimore, MD 21223; 1604 Thomas Avenue, Baltimore, MD 21216; 1711, 1713 and 1942 Vine Street, Baltimore, MD 21223; 3511 Virginia Avenue, Baltimore, MD 21215; 2909 and 2939 Walbrook Avenue, Baltimore, MD 21216; 2803 Waldorf Avenue, Baltimore, MD 21215 | 905,280 |

3

# APPENDIX II

## AFFILIATES' REAL ESTATE

| DEBTOR/ OWNER | PROPERTY DESCRIPTION | ESTIMATED MARKET VALUE |
|---|---|---|
| City Homes Central I Business Trust | 1640 E. 25th St. Baltimore, MD 21213; 1122 Carrollton Ave. Baltimore, MD 21217; 1814 Dukeland St. Baltimore, MD 21216; 1650 Gorsuch Ave. Baltimore, MD 21218; 2213 Henneman Ave. Baltimore, MD 21213; 2565 McCulloh St. Baltimore, MD 21217; 1628 N. Wolfe St. Baltimore, MD 21213 | $108,360 |
| City Homes Central II Business Trust | 1637 Carswell St. Baltimore, MD 21218; 2555 W. Fairmount Ave. Baltimore, MD 21223; 2526 Frederick Ave. Baltimore, MD 21223; 3041 Grayson St. Baltimore, MD 21216; 2034 Hollins St. Baltimore, MD 21223; 2442 McCulloh St. Baltimore, MD 21217; 2904 Rockrose Ave. Baltimore, MD 21215; 2609 W. Fairmount Ave. Baltimore, MD 21223; 1401 N. Washington St. Baltimore, MD 21213 | 139,320 |
| City Homes Central III Business Trust | 444 E. 23rd St. Baltimore, MD 21218; 1741 E. 25th St. Baltimore, MD 21213; 1107 Ashburton Ave. Baltimore, MD 21216; 2440 Ashland Ave., 1st and 2nd floors Baltimore, MD 21205; 1801 Chilton St. Baltimore, MD 21218; 5202 Craig Ave. Baltimore, MD 21212; 3423 Edmondson Ave. Baltimore, MD 21229; 1332 Mosher St. Baltimore, MD 21217; 1817 N. Rutland Ave. Baltimore, MD 21213 | 154,800 |
| City Homes Central IV Business Trust | 12 N. Bentalou St. Baltimore, MD 21223; 3418 Edmondson Ave Baltimore, MD 21229; 1073 Ellicott Driveway Baltimore, MD 21216; 3406 Gwynns Fall Parkway Baltimore, MD 21216; 1567 Homestead St. Baltimore, MD 21218 (including garage); 4224 Ivanhoe Ave. Baltimore, MD 21212; 5255 Linden Heights Ave. Baltimore, MD 21215; 2211 Lynnbrook Ave. Baltimore, MD 21217; 931 N. Patterson Park Baltimore, MD 21205 | 139,320 |
| City Homes Central V Business Trust | 1700 E. 28th St. Baltimore, MD 21218; 2440 Druid Hill Ave. Baltimore, MD 21217; 1313 N. Ensor St. Baltimore, MD 21202; 1013 W. Fayette St. Baltimore, MD 21223; 2004 E. Lafayette Ave. Baltimore, MD 21213; 2641 Loyola Southway Baltimore, MD 21215; 213 S. Monroe St. Baltimore, MD 21223; 4630 Pimlico Rd. Baltimore, MD 21215; 2113 W. Saratoga St. Baltimore, MD 21223 | 139,320 |
| City Homes Patriots I, LLC | 1533 Barclay St. Baltimore, MD 21202; 2424 E. Biddle St. Baltimore, MD 21213; 2524 Boyd St. Baltimore, MD 21223; 1541 N. Broadway, 1st, 2nd, and 3rd floors Baltimore, MD 21213; 1719 N. Broadway, 1st, 2nd, and 3rd floors Baltimore, MD 21213; 1326 Calhoun St., 1st, 2nd, and 3rd floors Baltimore, MD 21217; 1328 Calhoun St., 1st, 2nd, and 3rd floors Baltimore, MD 21217; 2207 Callow Ave., 1st, 2nd, and 3rd floors Baltimore, MD 21217 | $198,400 |

2

| DEBTOR/ OWNER | PROPERTY DESCRIPTION | ESTIMATED MARKET VALUE |
|---|---|---|
| City Homes Patriots IV LLC | 2235 Jefferson St. Baltimore, MD 21205; 2422 Jefferson St. Baltimore, MD 21205; 2024 W. Lanvale St. Baltimore, MD 21217; 1704 N. Milton Ave. Baltimore, MD 21213; 1813 W. Mulberry St. Baltimore, MD 21223; 721 Newington Ave., 1st, 2nd, and 3rd floors Baltimore, MD 21217; 2013 E. Oliver St. Baltimore, MD 21213; 2015 E. Oliver St. Baltimore, MD 21213 | 110,222 |
| City Homes Patriots V LLC | 1827 Presstman St. Baltimore, MD 21217; 1704 Regester St. Baltimore, MD 21213; 923 N. Stricker St., 1st and 2nd floors Baltimore, MD 21217; 1120 N. Stricker St., 1st and 2nd floors Baltimore, MD 21217; 1214 N. Stricker St., 1st and 2nd floors Baltimore, MD 21217; 34 N. Wheeler Ave. Baltimore, MD 21223; 1603 N. Wolfe St. Baltimore, MD 21213 | 110,222 |
| City Homes Central I, LLC | None | $0 |
| City Homes Office Business Trust | 330 East 25th Street Baltimore, MD 21218 (corporate headquarters) | $138,000 |

3